UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>c/o U.S. Attorney's Office<br>601 D Street, NW<br>Washington, DC 20530,<br><br>Plaintiff,<br><br>v.<br><br>MOTOR TANKER SKIPPER BEARING INTERNATIONAL MARITIME NUMBER 9304667, AND THE OIL CARGO LADEN THEREON,<br><br>Defendants *In Rem*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil A. No.  1:26-CV-00697 |

## <u>UNITED STATES' VERIFIED COMPLAINT FOR FORFEITURE *IN REM*</u>

COMES NOW, Plaintiff the United States of America (the "United States"), by and through the United States Attorney's Office for the District of Columbia, the Money Laundering, Narcotics, and Forfeiture Section of the Criminal Division, and the Counterintelligence and Export Control Section of the National Security Division, which brings this verified complaint for forfeiture in a civil action *in rem*, in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure, against: the Motor Tanker (M/T) SKIPPER bearing International Maritime Number ("IMO") 9304667, together with the oil cargo laden on the SKIPPER at the time it was seized by the U.S. Government in December 2025 ("Defendant Property"), and alleges as follows:

## NATURE OF THE ACTION AND DEFENDANT *IN REM*

1.       This *in rem* forfeiture action arises out of an investigation by Homeland Security Investigations ("HSI") and the Federal Bureau of Investigation ("FBI"). The United States is

investigating the transportation and sale of Iranian oil products for the benefit of the Islamic Revolutionary Guard Corps ("IRGC") and the IRGC Quds Force ("IRGC-QF").  This action seeks to forfeit the Defendant Property which affords the Iranian Ministry of Petroleum, the National Iranian Oil Company ("NIOC"), and the vessel's owner and its commercial and technical manager a source of influence over the Iranian Ministry of Petroleum, NIOC, the IRGC, including the IRGC-QF, by transporting Iranian petrochemical products to generate revenue for the IRGC, a designated Foreign Terrorist Organization (FTO).

2.      The SKIPPER was seized from Windward Shipmanagement Corporation, the owner of the vessel, and Fortis Fluctus Shipmanagement Inc., the technical management company, while it was laden with approximately 1,894,377 barrels of Venezuelan petroleum cargo, for which, at the time, a seizure warrant was not obtained.

## JURISDICTION AND VENUE

3.      This Court has *in rem* jurisdiction over the Defendant Property pursuant to 28 U.S.C. §§ 1333, 1345, and 1355.

4.      Venue is also proper within this judicial district pursuant to 28 U.S.C. § 1355(b)(2).

5.      Pursuant to 14 U.S.C. § 522(a) and 28 U.S.C. §§ 2461(b), 1333(1), this court has jurisdiction for property subject to forfeiture on the high seas.

## FACTS GIVING RISE TO FORFEITURE

A.      **Relevant Entities**

i.      **Government of Iran**

6.      On January 19, 1984, the United States designated Iran as a state sponsor of terrorism.  *See*  https://www.state.gov/reports/country-reports-on-terrorism-2020/iran/.    For 2020, the most recent year for which Country Reports on Terrorism are available, the State

Department concluded that "Iran continued its terrorist-related activity in 2020, including support for Hizballah, Palestinian terrorist groups in Gaza, and various terrorist and militant groups in Iraq, Syria, and elsewhere throughout the Middle East." *Id.* The State Department further found that "Iran used the Islamic Revolutionary Guard Corps – Qods Force (IRGC-QF) to provide support to terrorist organizations, provide cover for associated covert operations, and create instability in the region," and that "the IRGC-QF is Iran's primary mechanism for cultivating and supporting terrorist activity abroad." *Id.* To date, the United States has not delisted Iran as a state sponsor of terrorism. *See* https://www.state.gov/state-sponsors-of-terrorism/.

      **ii.**      **Iranian Ministry of Petroleum**

      7.      According to the Iranian Ministry of Petroleum's website, the ministry "is a state-run organ affiliated with the Executive branch of government" that was established in 1979. https://en.mop.ir/home/. The ministry reports that it "is tasked with exercising the principle of Iran's ownership of and national sovereignty over oil and gas resources as well as separating governance from administrative tasks in the development of oil and gas industry." *Id.* The ministry exercises its authority over the petroleum industry through four subsidiaries – NIOC, the National Iranian Gas Company, the National Iranian Oil Refining and Distribution Company, and the National Petrochemical Company. *Id.* ("The structural organization of the Ministry comprises a head office and four main subsidiaries – National Iranian Oil Company (NIOC), National Iranian Gas Company (NIGC), National Iranian Oil Refining and Distribution Company (NIORDC) and National Petrochemical Company (NPC). Through subsidiaries, the Ministry supervises exploration, extraction, marketing and selling of crude oil, natural gas and petroleum products in the country.").

8.     The Iranian government's ownership of petroleum resources stems from Articles 44 and 45 of Iran's constitution.    Article 44 provides in part: "The economy of the Islamic Republic of Iran is to consist of three sectors: state, cooperative, and private, and is to be based on systematic and sound planning.    The state sector is to include all large-scale and mother industries, foreign trade, major minerals, banking, insurance, power generation, dams and large-scale irrigation networks, radio and television, post, telegraph and telephone services, aviation, shipping, roads, railroads and the like; all these will be publicly owned and administered by the State."    https://www.constituteproject.org/constitution/Iran_1989.pdf?lang=en. [1]  Article  45 provides in part: "Public wealth and property, such as uncultivated or abandoned land, mineral deposits, seas, lakes, rivers and other public water-ways, mountains, valleys, forests, marshland, natural forests, unenclosed pastureland, legacies without heirs, property of undetermined ownership, and public property recovered from usurpers, shall be at the disposal of the Islamic government for it to utilize in accordance with the public interest."    *Id.*

9.     Article 2 of Iran's Oil Law (Sep. 30, 1987) provides: "The country's oil resources are part of the Anfal and public wealth, and according to Article 45 of the Constitution, is at the disposal of the Islamic government, and all facilities, equipment, assets and investments that have been or will be made by the Ministry of Oil and subsidiaries at home and abroad will belong to the Iranian people and to the Islamic government.    The exercise of sovereignty and ownership of oil resources and facilities belongs to the Islamic Government, which according to the provisions and powers enumerated in this law, it is the responsibility of the Ministry of Oil to act in accordance

---

[1]     The Constitution of the Islamic Republic of Iran was adopted and went into force in 1979.  It has been amended once, on July 28, 1989.

with the general principles and plans of the country." https://en.mop.ir/portal/home/?news/ 368984/368988/379478/petroleum-law.

10.     On October 26, 2020, the Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated the Iranian Ministry of Petroleum under Executive Order 13,224 for providing financial support to the Islamic Revolutionary Guard Corps – Quds Force ("IRGC-QF"). *See* https://home.treasury.gov/news/press-releases/sm1165. OFAC found that "[t]he Iranian Ministry of Petroleum has been used by individuals at the highest levels of the Iranian regime to facilitate the IRGC-QF's revenue generation scheme." *Id.*

### iii.     Islamic Revolutionary Guard Corps

11.     The IRGC is a branch of the Iranian armed forces whose purpose is to defend the country's political system. The IRGC-QF is a branch of the IRGC that specializes in unconventional warfare and military intelligence operations.

12.     The Department of the Treasury has found "[t]he IRGC is Iran's most powerful economic actor, dominating many sectors of the economy, including energy, construction, and banking." https://home.treasury.gov/news/press-releases/tg1718. According to OFAC, "[t]he IRGC and its major holdings, such as the Basij Cooperative Foundation and Khatam al-Anbiya, have a dominant presence in Iran's commercial and financial sectors, controlling multi-billion-dollar businesses and maintaining extensive economic interests in the defense, construction, aviation, oil, banking, metal, automobile and mining industries, controlling multi-billion dollar businesses." https://home.treasury.gov/news/press-releases/sm703.

13.     The IRGC and IRGC-QF use a network of shipping companies and front companies to hide their involvement in the sale and shipment of Iranian oil. Specifically, OFAC has found that the IRGC-QF uses a "complex network of intermediaries … to obfuscate its involvement in

selling Iranian oil." https://home.treasury.gov/news/press-releases/sm767; *see also* https://home.treasury.gov/news/press-releases/tg1718 ("The IRGC, long a target of U.S. sanctions, has a history of attempting to circumvent sanctions by maintaining a complex network of front companies."). The Secretary of the Treasury has previously found that holding groups and companies in the petrochemical sector and elsewhere "provide financial lifelines to the IRGC." https://home.treasury.gov/news/press-releases/sm703.

14. The IRGC generates substantial revenues from the sale of petroleum products. For example, OFAC has reported that "[i]n spring 2019 alone, this IRGC-QF-led network employed more than a dozen vessels to transport nearly 10 million barrels of crude oil, predominantly to the Syrian regime. These shipments, taken collectively, sold for more than half a billion dollars. The same network also sold nearly four million barrels of condensate and hundreds of thousands of barrels [of] gas oil, bringing in another quarter billion dollars." https://home.treasury.gov/news/press-releases/sm767.

15. The IRGC uses the proceeds from the distribution of petroleum to fund its terror activities. OFAC has found that: "Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime and funds its malign activities throughout the Middle East." https://home.treasury.gov/news/press-releases/sm885; *see also* https://home. treasury.gov/news/press-releases/sm703 ("The profits from [the IRGC's economic] activities support the IRGC's full range of nefarious activities, including the proliferation of weapons of mass destruction (WMD) and their means of delivery, support for terrorism, and a variety of human rights abuses, at home and abroad."). The Secretary of the Treasury has stated: "Iran's petrochemical and petroleum sectors are primary sources of funding for the Iranian regime's global

terrorist activities and enable its persistent use of violence against its own people."
https://home.treasury.gov/news/press-releases/sm885.

16.     On October 25, 2007, OFAC designated the IRGC-QF under Executive Order
13,224, which is "aimed at freezing the assets of terrorists and their supporters."    *See*
https://2001-2009.state.gov/r/pa/prs/ps/2007/oct/94193.htm.    In part, OFAC found that "[t]he
Qods Force, a branch of the Islamic Revolutionary Guard Corps (IRGC; aka Iranian Revolutionary
Guard Corps), provides material support to the Taliban, Lebanese Hizballah, Hamas, Palestinian
Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command (PFLP-
GC)."    *Id.*    On October 13, 2017, OFAC designated the IRGC pursuant to Executive Order
13,224 for providing material support, including training, personnel, and military equipment, to
the IRGC-QF.    *See* https://home.treasury.gov/news/press-releases/sm0177.

17.     On April 8, 2019, the President announced that he would designate the IRGC,
including the IRGC-QF, as a Foreign Terrorist Organization under Section 219 of the Immigration
and Nationality Act ("INA") (8 U.S.C. § 1189).    *See* https://ir.usembassy.gov/statement-from-
the-president-on-the-designation-of-the-islamic-revolutionary-guard-corps-as-a-foreign-terrorist-
organization/.    The announcement noted, in part, that "the IRGC actively participates in, finances,
and promotes terrorism as a tool of statecraft," and warned that "[i]f you are doing business with
the IRGC, you will be bankrolling terrorism."    *Id.*    On April 8, 2019, the State Department
similarly announced the pending designation of the IRGC, including the IRGC-QF.    *See*
https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/index.html.
That announcement noted that "[T]he IRGC—most prominently through its Qods Force—has the
greatest role among Iran's actors in directing and carrying out a global terrorist campaign."    *Id.*
On April 15, 2019, the Secretary of State published a notice in the Federal Register that he had

designated the IRGC, including the IRGC-QF, as a Foreign Terrorist Organization under Section 219 of the INA.  *See* 84 Fed. Reg. 15,278 (Apr. 15, 2019), https://www.federalregister.gov/documents/2019/04/15/2019-07415/in-the-matter-of-the-designation-of-the-islamic-revolutionary-guard-corps-and-other-aliases-as-a.

18.    The IRGC and IRGC-QF act in foreign commerce with specific aims to threaten U.S. interests and the national security of the United States.   The following is just a brief list of many examples of how the IRGC and IRGC-QF engage in foreign commerce and activities outside the borders of Iran to harm the interests of the United States:

a.    In likely retaliation for the death of former IRGC-QF commander Qasem Soleimani, in 2021, a member of the IRGC used interstate commerce facilities in a failed plot to commit murder-for-hire and provide material support to a transnational murder plot targeting former National Security Advisor John Bolton, https://www.justice.gov/opa/pr/member-irans-islamic-revolutionary-guard-corps-irgc-charged-plot-murder-former-national.

b.    In January 2007, the IRGC-QF led by Abdul Reza Shahla'i planned an attack in Karbala, Iraq that killed five U.S. soldiers and wounded three others, https://rewardsforjustice.net/rewards/abdul-reza-shahlai/.

c.    In June 1996, the IRGC was responsible for planning the attack on the Khobar Towers in Dhahran, Saudi Arabia, during which 19 U.S. Air Force personnel were killed and more than 350 were injured, *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 174 (D.D.C. 2010).   IRGC senior officials recruited the attackers and worked in conjunction with them and Hezbollah, operating out of a terrorist base in the Bekaa or Beqaa Valley in Lebanon where the IRGC provided supplies and funds for the attack.   *Id.*

19.     Through these actions and many others, the IRGC and IRGC-QF's terrorism affects foreign commerce in a manner that harms the interests of the United States, both domestic and abroad.    Indeed, the entire purpose of the IRGC and IRGC-QF's campaigns of terror are to thwart the United States' diplomatic efforts, including its support for peace in the Middle East and recognition of Israel, by threatening the security of U.S. nationals and attempting to instill fear in the citizens of this country located within and outside its territorial boundaries.    *See In re Sealed Case*, 936 F.3d 582, 592 (D.C. Cir. 2019) (criminal defendant's use of drug trafficking to support terrorist organizations "magnifies the effect of his conduct on commerce between the countries where he was operating and the United States").    These terrorist activities undertaken in foreign commerce plainly have a domestic effect on the United States.

###    iv.    National Iranian Oil Company

20.     NIOC is the national oil company of Iran and a subsidiary of the Iranian Ministry of Oil.    NIOC describes itself as "one of the largest oil firms in the world with huge hydrocarbon reserves."    https://en.nioc.ir/en-US/en.nioc/5696/page/NIOC-at-a-Glance.    NIOC reports that it is "responsible for organizing and policy-making activities of the oil industry, including exploration, drilling, production, research and development, as well as oil and gas exports."    *Id.*; *see also* https://home.treasury.gov/news/press-releases/sm1165 ("NIOC, overseen by the Ministry of Petroleum, is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran.").    According to OFAC, the distribution of NIOC oil "helps to finance Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and its terrorist proxies." https://home.treasury.gov/news/press-releases/sm885.

21.     On September 24, 2012, the Department of the Treasury reported to Congress that it had determined that NIOC was an agent or affiliate of the IRGC.    *See* https://home.treasury.

gov/news/press-releases/tg1718.    On October 26, 2020, OFAC designated NIOC pursuant to Executive Order 13,224 "for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, the IRGC-QF."    *See* https://home.treasury.gov/news/press-releases/sm1165.

### v.    Iranian Oil Terminals Company

22.    The Iranian Oil Terminals Company ("IOTC") is a subsidiary of NIOC that operates the Kharg Oil Terminal at Kharg Island, Iran.    *See* https://en.nioc.ir/en-US/en.nioc/5699 /page/Subsidiaries (listing IOTC as a subsidiary); *see also* https://www.iotco.ir/en/aboutus/ introductioncompany (stating that IOTC is "one of the companies under [the] umbrella of [the] National Iranian Oil Company").    IOTC describes itself as "an operational, specialized and professional organization that has the duty of all reservation affairs, crude oil, oil products, liquefied gas and marine services export and import operations along with providing measurement and lab services."    *Id.*    According to IOTC, its responsibilities include "support and sustained continuation of oil and gas production in the country in four operational zones of Kharg Oil Terminals." *Id.*    According to Orbis, a corporate reporting service, the government of Iran is the "global ultimate owner" of IOTC.

### vi.    Kharg Oil Terminal

23.    Kharg Oil Terminal is an oil terminal located at Kharg Island, Iran that is operated by IOTC.    The terminal has quays or jetties for loading petroleum onto crude oil tankers.    *See* https://www.iotco.ir/en/oilterminals/kharg.

24.    According to IOTC's website, Kharg Oil Terminal receives oil via pipeline from Iran's South Oilfields, which are operated by the National Iranian South Oil Company ("NISOC"). *See id.*

### vii.    National Iranian South Oil Company

25.    According to NISOC's LinkedIn page, "National Iranian South Oil Company (NISOC) . . . is a government-owned corporation under the direction of the Ministry of Petroleum of Iran and operates as a subsidiary of National Iranian Oil Company."    *See also* https://en.nioc.ir/en-US/en.nioc/5699/page/Subsidiaries (listing NISOC as a subsidiary of NIOC).

### viii.    Triton Navigation Corporation

26.    Triton Navigation Corporation is a Marshall Islands-registered company that was sanctioned by OFAC on November 3, 2022, for its role in "international oil smuggling network that facilitated oil trades and generated revenue for Hizballah and the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF)" and for its connection with Victor Artemov. https://home.treasury.gov/news/press-releases/jy1076. In the same action, the M/T ADISA, which was later renamed the SKIPPER, was identified as blocked property in which Triton Navigation Corporation had an interest.

### ix.    Windward Shipmanagement Corporation

27.    Windward Shipmanagement Corporation ("Windward") is a Seychelles-registered company and the current owner of the SKIPPER. It shares a Seychelles address with at least a dozen other companies that have been sanctioned by OFAC under the Iran, Russia, and Global Terrorism sanctions programs.

### x.    M/T SKIPPER

28.    The M/T SKIPPER (IMO 9304667) is a crude oil tanker built in 2005. It flies the flag of Guyana, but according to information provided by the U.S. Embassy in Georgetown, Guyana, the vessel is not legitimately flagged in Guyana. Thus, it is flying a false Guyanese flag and is considered stateless.

29.    Further, since at least in or around May 2024, several news organizations reported that an unauthorized entity was falsely registering Iran-linked vessels under the Guyana flag as an obfuscation tactic. *See* https://www.lloydslist.com/LL1149046/Guyana-raises-rogue-registry-warning-as-sanctioned-tankers-falsely-fly-its-flag.



*The SKIPPER, located in the anchorage of José Terminal, Venezuela, on or about October 30, 2025*

30.    The SKIPPER, at the time named the M/T ADISA, was also sanctioned by OFAC on November 3, 2022. https://home.treasury.gov/news/press-releases/jy1076.

31.    A data and analytics company that provides real-time intelligence on global commodity and shipping markets reports that the SKIPPER exhibited multiple AIS spoofing incidents between 2024 and 2025. These include repeated falsified transmissions within the Persian Gulf region (Iran–Iraq) and Gulf of Guinea (Ghana–Nigeria), as well as anomalous signal activity between Egypt and the Mediterranean Sea. The recurrence and geographic spread of spoofing events indicate deliberate obfuscation of voyage routes and/or sanctions evasion-related concealment patterns.

32.    AIS "spoofing" is a deceptive shipping practice that involves tampering with the vessel's Automatic Identification System ("AIS"), a tool used to broadcast vessel position, vessel

identity, and other critical information to nearby vessels and maritime authorities, used for collision avoidance.

33.    AIS spoofing involves the deliberate falsification of AIS messages, misleading vessels and maritime authorities about a ship's true location and identity, a potential illicit activity. This can be done by transmitting false AIS data or altering legitimate ones. By manipulating AIS transmissions, malicious actors, especially tankers operators, can create "ghost ships," obscure true vessel movements, or simulate fleet movements, creating significant security vulnerabilities. AIS spoofing is a method regularly deployed by individuals and entities involved in shipping illicit oil, including Iran-origin oil for the benefit of the IRGC, as spoofing makes it more difficult to detect an oil shipment's origins.

**B.    Venezuela Oil Exports**

34.    According to a confidential human source ("CHS")[2], the SKIPPER has a history of exporting crude oil from the José Terminal in Venezuela, which is owned and operated by Petróleos de Venezuela, S.A. ("PdVSA") and its subsidiaries. PdVSA is the Venezuelan state-owned oil company, which was designated by OFAC in January 2019 as an SDN pursuant to E.O. 13850. According to OFAC, PdVSA is a primary source of Venezuela's income and foreign currency (including U.S. dollars) and "has long been a vehicle for corruption," allowing the Maduro regime to embezzle billions of dollars from PdVSA for the personal gain of corrupt Venezuelan officials and businessmen. *See* https://home.treasury.gov/news/press-releases/sm594. Since as early as 2005, one of PDVSA's primary objectives has been to provide large and easily adjustable revenues to the Venezuelan government. For example, in 2005 and 2006, PdVSA paid

---

[2] From 2021 to the present, this CHS and the CHS's company have been paid approximately $560,000 for time and professional services in this and related investigations. The United States has additionally reimbursed the CHS for travel costs incurred in related investigations.

the Venezuelan government 71.1% and 74.6%, respectively, of the revenues it obtained from Venezuelan operations. Multiple examples of the SKIPPER loading Venezuela oil are discussed below.

35.    In or around May 2021, the SKIPPER loaded approximately 1.9 million barrels of crude oil from the José Terminal.



*SKIPPER loading at the José Terminal on or about May 5, 2021*

36.    On or about March 14, 2022, the SKIPPER loaded approximately 1.8 million barrels of crude oil from the José Terminal, Venezuela. The SKIPPER transferred the oil via ship-to-ship ("STS") transfer to the M/T VIGO (IMO 9208136) near Melaka, Malaysia. Such STS transfers are often used to obscure the origin of petrochemical products to evade sanctions and other laws and regulations.



*Satellite image of the SKIPPER near José Terminal, Venezuela*
*on or about March 13, 2022*

37.    On or about November 15, 2025, and on or about November 17, 2025, the SKIPPER loaded approximately 1.8 million barrels of Venezuela-origin crude oil (the "SKIPPER's Oil Cargo") at the José Terminal in Venezuela. According to bills of lading and quality certificates found on the SKIPPER, the crude oil was supplied by PdVSA or one of its subsidiaries. According to the same bills of lading, the SKIPPER's Oil Cargo was consigned to two entities. Approximately 1.1 million barrels of the SKIPPER's Oil Cargo would be delivered to Cubametales, the Cuban state-run oil import and export company that was designated by OFAC in or around July 2019. The remaining approximately 900,000 barrels of the SKIPPER's Oil Cargo would be delivered to Forever Energy Trade, Co., Ltd., in or around Malaysia.

38.    Shortly after execution of the seizure warrant, personnel onboard the SKIPPER were interviewed and indicated that the vessel was initially directed to Cuba but after bunkering

(loading fuel supply for propulsion and power) in or near Venezuelan waters, the personnel were informed to not transit to Cuba and immediately transit to another country in Asia.

39.     The SKIPPER was carrying the SKIPPER's Oil Cargo when it was seized by U.S. authorities on or about December 10, 2025.

**C.    Multiple SKIPPER loadings at Kharg Oil Terminal**

40.     According to the CHS, in the past two years, the SKIPPER has loaded more than seven million barrels of Iran-origin crude oil – worth hundreds of millions of dollars – from Kharg Island, Iran, most recently in or around July 2025.

41.     On or about February 6, 2024, the vessel M/T DERYA (IMO 9569700), an OFAC-designated oil tanker owned and operated by the sanctioned National Iranian Tanker Company ("NITC"), loaded two million barrels of crude oil from Kharg Island, Iran.



*DERYA loading from Kharg Island on or about February 6, 2024*

42.    On or about February 26, 2024, the SKIPPER received the two million barrels of crude oil from the DERYA via an STS transfer that took place west of Kharg Island.



*DERYA transfers cargo to SKIPPER on or about February 26, 2024*

43.    On or about March 3, 2024, the SKIPPER engaged in an STS transfer with the M/T ANNA (IMO 9233208) to transfer approximately 550,000 barrels of the Iran-origin crude oil to the ANNA. On or about November 3, 2022, as a part of the Artemov designation, OFAC identified the ANNA (then named the M/T RAIN DROP) as property in which a blocked person has an interest. On or about March 5, 2024, the SKIPPER delivered the remaining 1.45 million barrels to Baniyas, Syria, which at the time was a jurisdiction subject to comprehensive U.S. sanctions.



*SKIPPER transfers cargo to ANNA on or about March 3, 2024*

44.     According to the CHS, in or around July 2024, the SKIPPER delivered approximately 1.94 million barrels of crude oil from Kharg Island, Iran to Baniyas, Syria. On or about July 21, 2024, the SKIPPER transferred part of her cargo via STS transfer to the M/T VERONICA (IMO 9256860) in the anchorage area of Larak Island, Iran before continuing on to Syria. The VERONICA is a sanctioned oil tanker flying a false Guyanese flag. OFAC designated the VERONICA on or about February 22, 2022, under its prior name, the M/T PEGAS, for being property of PSB Lizing OOO, a designated subsidiary of Russia-based Promsvyazbank ("PSB"). The VERONICA has engaged in ghost/shadow fleet[3] activity off the coast of Venezuela, where it had performed multiple STS transfers with other designated ghost/shadow fleet vessels, until it was seized by the United States on January 15, 2026.

---

[3] Vessels engaged in illicit oil shipment activity and violating U.S. sanctions often are referred to as comprising the international "Ghost Fleet."



*SKIPPER STS transfer with VERONICA near Larak Island, Iran anchorage*
*on or about July 21, 2024*

45. According to satellite imagery reviewed by the CHS, on or about February 5, 2025, the SKIPPER loaded approximately 1.88 million barrels of crude oil from Kharg Island, Iran.



*SKIPPER at anchorage in Kharg Island, Iran on or about January 30, 2025*

46. According to satellite imagery reviewed by the CHS, on or about July 7, 2025, the SKIPPER loaded approximately 1.95 million barrels of crude oil from Kharg Island, Iran. The oil was delivered to the M/T LUOIS (IMO 9312494) via STS transfer near Hong Kong.



*SKIPPER at anchorage in Kharg Island, Iran on or about July 7, 2025*



*An oil sample recovered from the SKIPPER bearing the NIOC logo and corresponding with the date of one of the SKIPPER's recent voyages to Iran*

### D.    The SKIPPER's Oil Cargo Is Also Subject to Forfeiture

47.    The United States seized the SKIPPER on the high seas on or about December 10, 2025. At the time of seizure, the SKIPPER was carrying approximately 1.8 million barrels on oil, which had been loaded onto the SKIPPER at José Terminal in Venezuela.

48.     Like the SKIPPER itself, the SKIPPER's Oil Cargo is subject to forfeiture under 18 U.S.C. § 981(a)(1)(G)(i) because (i) it supports the SKIPPER's operations and thus indirectly affords persons a source of influence upon the IRGC, including the IRGC-QF, for the same reasons that the SKIPPER itself affords such influence.

### i.    The SKIPPER's Oil Cargo Supports the SKIPPER's Operations

49.     More specifically, the SKIPPER's Oil Cargo furthers the affairs of the SKIPPER as a ghost tanker for Iran. Upon information and belief, all commercial freight loads taken aboard the SKIPPER—including the SKIPPER's Oil Cargo at issue here—help keep the SKIPPER as a profitable (or at least revenue-producing) vessel. Such revenue and/or profit streams are critical to keeping the SKIPPER operational, as the SKIPPER's owners and operators could not or would not maintain the SKIPPER as a seagoing vessel if the SKIPPER was not producing revenue and/or profit.

50.     Additionally, even non-Iranian freight loads taken aboard the SKIPPER help *conceal* the SKIPPER's primary role as an Iranian ghost fleet tanker, by providing a patina of non-Iranian activities that the SKIPPER in engaged in. For this reason as well, the SKIPPER's Oil Cargo furthers the affairs of the SKIPPER as a ghost fleet tanker for Iran.

### COUNT ONE – FORFEITURE
### 18 U.S.C. § 981(a)(1)(G)(i)

51.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to 50 above as if fully set forth herein for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(G)(i).

52.     The IRGC, including the IRGC-QF, is a designated foreign terrorist organization.

53.     The Defendant Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(i) because it affords persons (including, without limitation, NIOC, IOTC, NISOC,

Windward) sources of influence over the IRGC, including the IRGC-QF, a designated foreign terrorist organization, which has engaged in planning and perpetrating federal crimes of terrorism as defined in 18 U.S.C. § 2332b(g)(5) against the United States, citizens or residents of the United States, or their property.

*  *  *

WHEREFORE, the plaintiff prays that all persons who reasonably appear to be potential claimants with interests in the Defendant Property be cited to appear herein and answer the complaint; that the defendant property be forfeited and condemned to the United States of America; that upon Final Decree of Forfeiture, the United States Marshal dispose of the defendant property according to law; and that the plaintiff have such other and further relief as this Court deems proper and just.

Dated: February 26, 2026
       Washington, D.C.

Respectfully submitted,

Jeanine Ferris Pirro
United States Attorney

By:    /s/ *Rajbir Datta*
       RAJBIR DATTA
         N.Y Bar 5206073
       Assistant United States Attorney
       United States Attorney's Office
       601 D Street, N.W.
       Washington, D.C. 20579
       (202) 252-7687
       Rajbir.Datta@usdoj.gov

       /s/ *Rick Blaylock, Jr.*
       RICK BLAYLOCK, JR.
         T.X. Bar No. 24103294
       Assistant United States Attorney
       Asset Forfeiture Coordinator
       United States Attorney's Office
       601 D Street, N.W.
       Washington, D.C. 20001
       (202) 252-6765
       Rick.blaylock.jr@usdoj.gov

John Eisenberg
Assistant Attorney General
National Security Division

By:   */s/ Sean Heiden*_____
      Sean Heiden
        D.C. Bar 1617636
      Trial Attorney
      Counterintelligence and Export Control Section,
      National Security Division
      Sean.heiden2@usdoj.gov

Margaret A. Moeser
Chief, Money Laundering, Narcotics and Forfeiture
Section, Criminal Division
U.S. Department of Justice

By:      */s/ Joshua L. Sohn*_____
      Joshua L. Sohn
      Trial Attorney

## **VERIFICATION**

I, Cindy Burnham, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 26th day of February 2026.

___*/s/ Cindy Burnham*_____
Special Agent Cindy Burnham
Federal Bureau of Investigation


I, Benjamin Brown, a Special Agent with the Homeland Security Investigations, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 26th day of February 2026.

___*/s/ Benjamin Brown*_____
Special Agent Benjamin Brown
Homeland Security Investigations