**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:26-CV-00697 |
| Plaintiff, | |
| v. | |
| MOTOR TANKER SKIPPER BEARING INTERNATIONAL MARITIME NUMBER 9304667, AND THE OIL CARGO LADEN THEREON, | |
| Defendant *in rem*, | |

**HOGLAN CLAIMANTS' MOTION TO DISMISS AND/OR TRANSFER**

Claimant Candyce Hoglan, as personal representative of the Estate of Alice Hoglan, and the additional individuals and estates identified on Exhibit A to the Hoglan Claim (ECF No. 7-1) (collectively the "Hoglan Claimants"), ask the Court to dismiss this case, or, in the alternative, to transfer it to the United States District Court for the Southern District of Florida ("SDFL"). The grounds for the motion are that prior to the Government filing this action, the Hoglan Claimants arrested the M/T SKIPPER ("Skipper") (IMO 9304667), pursuant to an arrest warrant issued by the SDFL, which has prior exclusive *in rem* jurisdiction over the Skipper.[1]

**FACTUAL AND LEGAL BACKGROUND**

The Hoglan Claimants are family members and estates of persons who were murdered in the September 11, 2001 terrorist attacks. A Judgment in their favor was entered by the United States District Court for the Southern District of New York on February 26, 2018 in *Hoglan v. Islamic Republic of Iran*, Nos. 1:11-cv-07550 & 03-md-1570 (S.D.N.Y.), against the Islamic

---

[1] In order to avoid further duplication in the record of this proceeding in light of the multiple motions that have been filed, the Hoglan Claimants respectfully refer the Court to, and incorporate herein by reference, all affidavits and briefs previously filed.

Republic of Iran, a number of its political subdivisions, and certain of its agencies and instrumentalities (collectively, "Judgment Debtors") for the roles they played in the September 11 attacks. The outstanding amount of compensatory damages still owing to Claimants is $1,608,919,332.37, plus interest.

The Hoglan Claimants have worked diligently to enforce their Judgment against assets belonging to Iran, the IRGC, and the other Judgment Debtors, including their agencies and instrumentalities, both inside and outside the United States. As part of their judgment enforcement efforts, the Hoglan Claimants are actively pursuing shadow fleet oil tankers that are engaged in transporting sanctioned Iranian oil in the global markets and raising revenue to finance Iran's terrorist activities throughout the world.

On April 29, 2024, the Hoglan Claimants filed an *in rem* enforcement proceeding in the SDFL pursuant to Section 201(a) of the Terrorism Risk Insurance Act of 2002 ("TRIA"). *See Hoglan v. M/V Bluefins, et al.*, Case No. 1:24-cv-21628-JB (SDFL) (SDFL ECF No. 3). In that proceeding, the Hoglan Claimants sought to enforce their judgment against six shadow fleet oil tankers that had been sanctioned by the United States Department of Treasury's Office of Foreign Assets Control ("OFAC") on November 3, 2022. *See id*. Skipper, the Defendant Property in this case, is one of the six shadow fleet tankers that are defendants in *Hoglan v. Bluefins*. *See id.* At the time when the Hoglan Claimants filed their *in rem* proceeding in the Southern District of Florida, the Skipper was named M/V Adisa (IMO 9304667). *See* ECF No. 9-4. Although the Adisa later changed its name to Skipper, the International Maritime Organization Number ("IMO") is the same. Therefore, Skipper is the same vessel sanctioned by OFAC on November 3, 2022 and the same vessel sued by Claimants on April 29, 2024, which the Government does not dispute.

On September 12, 2025, the SDFL issued Arrest Warrants for each of the six shadow fleet tankers, including Skipper. A copy of the Arrest Warrant for Skipper is attached to the Hoglan Claimants' Verified Claim as Exhibit B. (ECF No. 7-2). The Arrest Warrant directed the United States Marshal for the Southern District of Florida to "to arrest the Cargo Sample Canister from Defendant M/V Adisa currently in the custody of Boies Schiller Flexner LLP and to detain the same in your custody pending further order of the Court." *Id.*

On November 26, 2025, more than two months after the SDFL issued its Arrest Warrant and the U.S. Marshal constructively arrested the Skipper via its Cargo Sample Canister, the United States obtained a sealed seizure warrant against the Skipper. *See* Order, dated December 12, 2025, at p. 3-4, a copy of which is filed at ECF No. 7-5. The United States executed the warrant on the Skipper, seizing it off the Coast of Venezuela, on December 10, 2025. *See id*. at p. 1; "Tanker Seized by US Off Venezuela Was Part of Iranian Shadow Fleet," Radio Free Europe, December 11, 2025, a copy of which is filed at ECF No. 7-6.

Promptly thereafter, on December 18, 2025, the Hoglan Claimants contacted the Government to advise it of their interest in the Skipper. *See* Letter dated December 18, 2025, from Martin De Luca and Kathleen Shannon to Diego Pestana, Acting Associate Deputy Attorney General, a copy of which is filed at ECF No. 7-7. In that letter, the Hoglan Claimants informed the Government that they had filed a complaint against the Skipper, that the SDFL had jurisdiction over the vessel, and that it had issued an arrest warrant for the Skipper on September 12, 2025. *Id*. The Hoglan Claimants and the Government continued communicating about their interest in the Skipper. During January 2026, among other things, in response to the Government's specific affirmative request, the Hoglan Claimants provided the Government with additional information concerning the vessel and their claim.

On February 26, 2026, the Government filed its forfeiture complaint (ECF No. 1), and a civil arrest warrant (ECF No. 2) in this Court. Yet, even though the Government knew the facts recited above, the forfeiture complaint did not inform the Court that (a) the SDFL had already asserted *in rem* jurisdiction over the Skipper, (b) the SDFL had issued an arrest warrant for Skipper before the Government's arrest warrant, and (c) the Hoglan Claimants had been actively communicating with the Government to assert their claim to the vessel. Additionally, even though the Government knew about the Hoglan Claimants' claim, it did not give them the direct notice contemplated by Rule G(4)(b) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Rule G"). Rather, the Government merely filed its forfeiture complaint and published notice of the forfeiture on the forfeiture.gov website on March 2, 2026. A copy of the March 2, 2026 Notice of Forfeiture is filed at ECF No. 7-8.

Then, on March 12, 2026, just fourteen days after filing the complaint and only ten days after publishing notice of the forfeiture, the Government moved for authorization to sell the Skipper. (ECF No. 4). Like the complaint, the motion for authorization to sell the Skipper did not inform the Court that the Hoglan Claimants had already filed a complaint *in rem* against the Skipper in the SDFL, nor that the SDFL had already asserted *in rem* jurisdiction over the vessel, nor that the SDFL had issued an arrest warrant for the vessel more than two months before the Government's November 26, 2025 seizure warrant and more than five months before its civil arrest warrant in this proceeding. Neither did the motion disclose that the Government was actively communicating with the Hoglan Claimants concerning their interest in the Skipper.

With no information before it concerning the Hoglan Claimants' prior claim to the vessel, perfected with a warrant and arrest as described above, the Court granted the Government's motion for authorization to sell the Skipper on Monday, March 16, 2026, two business days after

the Government filed the motion (ECF No. 6), and before the time for other parties, including the Hoglan Claimants, to assert interests in the vessel had not expired. *See* Fed. R. Civ. P. Supp. R. G(5)(a)(ii).

After attempts to reach an agreement regarding the Skipper's disposition stalled, the Hoglan Claimants moved to stay the Court's order authorizing sale of the Skipper. (ECF No. 9). The Court temporarily stayed the sale pending resolution of the Hoglan Claimants' motion. ECF No. 10). The Government then moved to strike the Hoglan Claimants' verified claim. (ECF No. 15). Both motions remain pending before the Court.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(3) authorizes dismissal of an action for improper venue. "In considering a Rule 12(b)(3) motion, the court accepts the plaintiff's well-pled factual allegations regarding venue as true, draws all reasonable inferences from those allegations in the plaintiff's favor, and resolves any factual conflicts in the plaintiff's favor." *Perlmutter v. Varone*, 59 F. Supp. 3d 107, 110 (D.D.C. 2014) (internal citations omitted). "The Court may consider material outside of the pleadings." *Id.* "Because it is the plaintiff's obligation to institute the action in a permissible forum, the plaintiff usually bears the burden of establishing that venue is proper." *Id.* "Unless there are pertinent factual disputes to resolve, a challenge to venue presents a pure question of law." *Id.*

Title 28 U.S.C. § 1404(a) permits district courts to "transfer any civil action to any other district ... where it might have been brought" if such transfer would serve "the interest of justice." "The movant 'must first show that the plaintiff could originally have brought the case in the transferee district.'" *Est. of Levin, v. Wells Fargo Bank, N.A.,* 2026 WL 879176, at *4 (D.D.C. Mar. 31, 2026) (citing *Ngonga v. Sessions*, 318 F. Supp. 3d 270, 274 (D.D.C. 2018)).

5

"When considering whether to transfer a case to a valid transferee forum, 'courts should balance case-specific factors which include the private interests of the parties and public interests such as efficiency and fairness.'" *Id.* (citing *Greater Yellowstone Coal. v. Bosworth*, 180 F. Supp. 2d 124, 127 (D.D.C. 2001)).

"Public interests include '(1) the transferee's familiarity with the governing laws and the pendency of related actions in the transferee's forum; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home.'" *Swecker v. United States*, 2017 WL 11467810, at *1 (D.D.C. May 17, 2017) (internal citations omitted). Private interests include "(1) the plaintiffs' choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses of the plaintiff and defendant ... and (6) the ease of access to sources of proof." *Id.* at *2.

## ARGUMENT

This action should be dismissed under the prior exclusive jurisdiction doctrine, or, in the alternative, transferred to the Southern District of Florida because the SDFL has jurisdiction over the vessel by virtue of its arrest pursuant to the SDFL warrant, which predated any action by the Government, including its Government's seizure warrant. If the Government wishes to contest the SDFL's jurisdiction over the Skipper, it must do so in that action, not before this Court.

### I.   The SDFL Issued and Executed a Valid Arrest Warrant for the Skipper.

Contrary to the Government's arguments in its various briefs, the SDFL Court issued and executed a valid arrest warrant for the Skipper two months before the Government sought a seizure warrant for the Skipper.

**A.    The Government Cannot Collaterally Attack the SDFL's Arrest Warrant or Jurisdiction over the Skipper.**

This action should be dismissed or transferred to the SDFL because that Court issued and executed a valid arrest warrant for the Skipper months before the Government seized the vessel. As detailed in the Hoglan Claimants' Reply in Support of the Emergency Motion to Stay, SDFL Judge Jacqueline Becerra reviewed the Hoglan Claimants' application and ordered the Clerk of Court to issue the arrest warrant. (ECF No. 2-3). The Government later disparages Judge Becerra's Order as "a one-page ministerial order that had no substantive reasoning." ECF No. 25 at 2. Yet the Government's own seizure warrant for the Skipper is likewise one page with no reasoning. *See* ECF No. 9-5 at 5.

The Government further argues that the "Florida court has *no* jurisdiction over the Skipper." ECF No. 13 at 2.  It simply ignores the fundamental principle that, as the Hoglan have demonstrated, ECF No. 18 at 1-2, "it is axiomatic that a district court lacks subject matter jurisdiction to review the decisions of other district court[s]…, this Court has no subject matter jurisdiction to reconsider the decisions of other federal district courts." *Atchison v. U.S. Dist. Cts.*, 190 F. Supp. 3d 78, 87 (D.D.C. 2016).

The Government thereafter doubled down on this argument, asserting that "there is nothing improper about this Court evaluating whether the Hoglans' unopposed Florida arrest warrant was valid or effective…" (ECF No. 25 at 3). To justify this position, the Government used an inapt analogy.  It analogized its request to a situation where a party wins a judgment in Court A and seeks to enforce it in Court B. The Government posited that Court B is permitted to "test the validity of the judgment awarded by" Court A and then claimed that this Court could similarly "test" the validity of the SDFL's exercise of jurisdiction and issuance of the arrest warrant.

But this argument is foreclosed by the overriding principle that the remedy for a purportedly erroneous district court decision is an appeal, not filing a new action addressing the same subject matter is another district.  For example, in *Matter of Search of One Digital Device Currently Located at 601 4th St. NW, Washington, DC Under Rule 41*, 734 F. Supp. 3d 107 (D.D.C. 2024), a magistrate judge in the Central District of California denied the Government's warrant application to search a cellphone.  In response, the Government transported the cellphone to this Court and submitted a substantially similar warrant application to search the phone. *See id.* at 108-109. The Court denied the warrant application because "when a federal judicial officer rules on an application that disposes of a case, the applicant has two options: it can seek reconsideration of the decision or it can seek review of the decision through the normal, hierarchical appellate process…Going to another court to seek a more favorable outcome from a judge of coordinate jurisdiction is not one of the options." *Id.* at 108. The Court described the Government's actions as an "attempt to manipulate the judicial system to find a judge likely to rule in its favor," as "conduct which abuses the judicial process," and as an attempt to "circumvent" and "eschew[ ] established procedures for reconsideration or appeal of [the California court's] ruling." *Id.* at 109-110. Just as the *One Digital Device* Court held that it "cannot be made a party to what is in effect an appeal from [another] Judge['s] ruling on the warrant application before her," the Court should reject the Government's invitation to "test" and invalidate Judge Becerra's decision to exercise *in rem* jurisdiction over the Skipper and issue the warrant for its arrest.

**B.     Admiralty Law Supports the Application of Constructive and Symbolic Arrest Doctrine to Stateless Vessels.**

In its arrest warrant, the SDFL directed the U.S. Marshal to take possession of the Skipper's Cargo Sample Canister. (ECF No. 7-2 at 2). Citing the long-standing doctrine of

constructive and symbolic arrest, the Hoglan Claimants have demonstrated in prior briefing that execution of the SDFL's arrest warrant by the U.S. Marshal was sufficient to bring the Skipper under the Court's jurisdiction. (ECF No. 9 at 12; ECF No. 18 at 6-9; ECF No. 21 at 7-9). The Government argues that this doctrine only applies to shipwreck cases and not actions involving an "intact, seagoing vessel." ECF No. 25 at 5-7. It also notes that the Hoglan Claimants did not cite any cases applying this doctrine to stateless vessels like the Skipper. But neither has the Government identified any cases foreclosing application of this doctrine to "intact, seagoing, [stateless] vessels." In the absence of any such decisions, fundamental principles of admiralty law support application of the constructive and symbolic arrest doctrine to stateless vessels.

The Government acknowledges that the Skipper is a stateless vessel engaged in illicit activity on the high seas. (ECF Nos. 1 ¶¶ 1, 48; 4 at 1-2). The high seas are "subject to the exclusive sovereignty of no nation." *United States v. Louisiana*, 363 U.S. 1, 34 (1960). Nevertheless, maritime law confers the power to exercise *in rem* jurisdiction on courts of all nations through "shared sovereignty" to ensure the high seas are not left "without enforceable law." *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 967-68 (4th Cir. 1999) (authorizing adjudication of *in rem* rights of shipwreck in international waters); *Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel*, 657 F.3d 1159, 1175 (11th Cir. 2011) (same). This "jurisdiction" exists under "'the common law of the seas,'" with district courts granted authority to hear such cases under 28 U.S.C. § 1333. *United States v. Batato*, 833 F.3d 413, 421 (4th Cir. 2016) (citing *Titanic*, 171 F.3d at 960). In particular, maritime law confers "shared sovereignty" over stateless vessels on the high seas. Under the law of the flag, "vessels are normally considered within the exclusive jurisdiction of the country whose flag they fly." *United States v. Marino-Garcia*, 679 F.2d 1373, 1380 (11th Cir. 1982). For purposes of territorial jurisdiction, a

flagged vessel is "deemed to be a part of that territory (whose flag it flies)." *Lauritzen v. Larsen*, 345 U.S. 571, 585 (1953); *United States v. Aybar-Ulloa*, 987 F.3d 1, 7 (1st Cir. 2021) ("'The deck of a private American vessel . . . is considered . . . constructively as territory of the United States.'" (citing *Ross v. McIntyre*, 140 U.S. 453, 464 (1891))). But when vessels – such as the Skipper here – are not flagged under the law of any nation, they are "floating sanctuaries from authority and constitute a potential threat to the order and stability of navigation on the high seas." *Marino-Garcia*, 679 F.2d at 1182.

For this reason, "international law permits any nation to subject stateless vessels on the high seas to its jurisdiction." *United States v. McPhee*, 336 F.3d 1269, 1273 (11th Cir. 2003). "'In the interest of order on the open sea, a vessel not sailing under the maritime flag of a State enjoys no protection whatever.'" *United States v. Cortes*, 588 F.2d 106, 110 (5th Cir. 1979) (quoting Oppenheim, International Law 546 (7th ed. 1948)). "Vessels without nationality are international pariahs" and "have no internationally recognized right to navigate freely on the high seas." *Marino-Garcia*, 679 F.2d at 1381. "[A]ll nations can treat them as their own territory and subject them to their laws." *United States v. Campbell*, 743 F.3d 802, 810 (11th Cir. 2014). Thus, because the Skipper is stateless, the SDFL could exercise constructive *in rem* jurisdiction over it and arrest it using any method that complies with the Supplemental Rules and principles of maritime law.

As the Hoglan Claimants have demonstrated, "[m]aritime law does not allow the Skipper to sail the high seas as a floating sanctuary from authority while simultaneously benefiting from jurisdictional defenses available to vessels operating lawfully—such as demanding physical arrest by a U.S. Marshal—to avoid accountability to terror victims in a United States court." ECF No. 21 at 10. Requiring the physical arrest of a stateless vessel would contravene "admiralty's

10

approach to do justice with slight regard to formal matters." *Continental Grain CO. v. The FBL-585*, 364 U.S. 19, 25 (1960); *British Transp. Comm'n v. United States*, 354 U.S. 129, 139 (1960) ("[A]dmiralty practice…should not be tied to the mast of legal technicalities it has been the forerunner in eliminating."). Instead, symbolic arrest, which is based on "'the fiction that the *res* is not divided and that therefore possession of some of it is constructively possession of all of it, '" is appropriate and serves the same purpose of bringing the entire vessel within the Court's jurisdiction. *Salvors, Inc. v. Unidentified Wrecked & Abandoned Vessel*, 861 F.3d 1278, 1287 (11th Cir. 2017) (citing *Titanic*, 171 F.3d at 964). Maritime law applies this fiction to *in rem* forfeitures, treating a ship and its cargo as part of a single forfeiture *res* for certain purposes. *See Gillam v. United States*, 27 F.2d 296, 303 (4th Cir. 1928); *The Mariana Flora*, 24 U.S. 1, 57 (1825) ("[I]f the vessel was sent in for adjudication, the cargo must, of necessity, accompany."); *The Rapid*, 12 U.S. (8 Cranch) 115, 162 (1814); *Maisonnaire v. Keating*, 16 F. Cas. 513, 517-18 (C.C.D. Mass. 1815).

In this regard, "[t]he fictions of in rem forfeiture were developed primarily to expand the reach of the courts and to furnish remedies for aggrieved parties," not to limit "claim[s] for redress," as the Government would have this Court do here. *See Republic Nat'l Bank of Miami v. United States*, 506 U.S. 80, 87 (1992). Courts "enjoy considerable latitude in maritime cases because, under the constitutional grant [of admiralty jurisdiction], the boundaries of maritime law generally were to be determined in the exercise of the judicial power." *Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1232 (11th Cir. 2014). And "there is no fundamental rule that actual seizure or possession of an object is always required for in rem jurisdiction." *Leopard Marine & Trading, Ltd. v. Easy Street Ltd.*, 896 F.3d 174, 188 & 186-87 (2d Cir. 2018) (collecting cases); *United States v. James Daniel Good Real Property*, 510 U.S. 43, 58 (1993)

11

("[P]rocess [may] be executed on real property without physical seizure."); *Batato*, 833 F.3d at 419-20 (exercising jurisdiction over property in foreign country); *Oil Tanker*, 480 F.Supp.3d at 44-45 (exercising jurisdiction over tanker without "constructive or actual possession").

Here, the U.S. Marshal's arrest of the Skipper's Cargo Canister fulfilled the same procedural functions as symbolic arrest of an artifact obtained from a shipwreck. The symbolic arrest enabled the warrants to be "served upon the vessel within the district" as required by Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions Rules E(3)(b) and E(4)(b), because the fiction of an undivided *res* ensures that the entire vessel is treated as present within the District for purposes of both service and jurisdiction. *Titanic*, 9 F. Supp. 2d at 632. The U.S. Marshal's transmittal of the Skipper's SDFL arrest warrant and the Hoglan Claimants' Complaint to the Skipper's Inmarsat line effectively satisfied the remaining requirements of Rule E(4)(b), where "the character or situation of the property [was] such that the taking of actual possession is impracticable," by delivering the process to the Skipper and providing copies to "the person having possession or the person's agent," namely the Skipper's master and owner. *See Fathom Exploration, LLC v. Unidentified Shipwrecked Vessel or Vessels*, 857 F.Supp.2d 1269, 1271 n.1 (S.D. Ala. 2012) (authorizing service by "seal[ing] the arrest pleadings in a tube" attached to an anchor and "screw[ing] the marker into the sea floor.").

The Government's characterization of caselaw cited by the Hoglan Claimants on this issue in the prior briefing is unpersuasive. For example, the Government claims that *United States v. Oil Tanker Bearing Int'l Mar. Org. No. 9116512*, 480 F. Supp. 3d 39 (D.D.C. 2020), does not support the Hoglan Claimants' argument that the SDFL gained constructive possession of the Skipper by seizing its Cargo Canister because *Oil Tanker* was a "civil forfeiture case[ ] where arrest was immaterial because civil forfeiture courts (unlike admiralty courts) do not need

12

to control the subject property." ECF No. 25 at 6. But this argument is contradicted by the Government's previous argument in its Opposition to the Hoglan Claimants' Emergency Motion to Stay that the instant action is a civil forfeiture action and thus the prior exclusive jurisdiction doctrine does not apply. *See* ECF No. 13 at 9.  In any event, the *Oil Tanker* decision holds that the court "does not need constructive or actual possession in order to have *in rem* jurisdiction over [vessels] which are located overseas." Since both the SDFL action and the instant action are *in rem* proceedings, this holding is directly on point. *See* ECF No. 1 at 1-2 (complaint alleges this is an *in rem* admiralty action).

**C.      The Southern District of Florida Has Prior Exclusive *In Rem* Jurisdiction Over the Skipper, Making Dismissal or Transfer Necessary.**

Under the prior exclusive jurisdiction doctrine, where equitable relief is sought regarding property that is already the subject of an ongoing *in rem* action in another court, that court has exclusive jurisdiction over the property. *See Hammer v. United States Dep't of Health & Hum. Servs.*, 905 F.3d 517, 536 (7th Cir. 2018) (under the prior exclusive jurisdiction doctrine, "two suits, both of which are *in rem* or *quasi in rem* and require the courts to have possession or control of the same property, cannot proceed at the same time, and the second court must yield to the first"); *The Hendrik Hudson*, 11 F. Cas. 1087 (N.D.N.Y. 1855) (*"*When once the vessel has been arrested by the admiralty, no other tribunal can take it out of its custody")*; Smith v. Nationstar Mortg., LLC*, 2015 WL 9581802, at *3 (D. Md. Dec. 29, 2015) (declining to assert jurisdiction over claims asserted in complaint regarding sale of vessel because "where equitable relief is sought regarding property that is already the subject of an ongoing *in rem* action in another court, the court controlling the property for purposes of the earlier-filed suit has exclusive jurisdiction over the property"); *Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S.

13

456, 466 (1939) ("the court first assuming jurisdiction over property may maintain and exercise that jurisdiction to the exclusion of the other").

As the Court of Appeals noted last year, the prior exclusive jurisdiction doctrine applies to cases such as the instant action because "one court hearing an *in rem* action must seize the property against which it is directed [as occurred here in the SDFL]. And a second court [here, the D.C. District Court] could not hear an *in rem* action against the same property without seizing it from the first, which would create unseemly conflicts between courts whose jurisdiction embraces the same subject." *Est. of Levin v. Wells Fargo Bank, N.A.*, 156 F.4th 632, 642-43 (D.C. Cir. 2025).

The Government previously argued that the prior exclusive jurisdiction doctrine does not apply because "this Court need not control the SKIPPER in order to adjudicate this civil forfeiture case. It is settled precedent in this Circuit that a civil forfeiture court need not control the defendant property." ECF No. 13 at 9. However, this argument ignores that the Government's action against the Skipper is expressly brought as an action *in rem. See* ECF No. 1 at 1. The Government cannot simultaneously use the requirements of *in rem* proceedings as a sword against the Hoglan Claimants' Florida proceedings (*see* ECF No. 25 at 3, "[t]o sustain *in rem* admiralty jurisdiction and thus give the plaintiff a valid claim over the defendant vessel, the vessel must actually be arrested under a warrant"), but then deny that the prior exclusive jurisdiction doctrine applies to *in rem* proceedings in its own suit.

Where, as here, the prior exclusive jurisdiction doctrine applies, the "rule is so strong that the first court to assume jurisdiction over the *res* may even enjoin proceedings in the second if such action would safeguard the integrity of its orders." *Est. of Levin*, 2026 WL 879176, at *5;

*see id.* (the first court's "initial exercise of jurisdiction . . . thus barred any other courts from exercising jurisdiction over the Blocked Funds under the prior-exclusive-jurisdiction rule").

Here, the Hoglan Claimants seek to dismiss or transfer this action in favor of the first-filed SDFL action. Because the SDFL initially exercised jurisdiction over the Skipper by issuing the arrest warrant and directing the U.S. Marshal to arrest the vessel via its Cargo Canister, it "inescapably follows," *id.*, that this Court cannot hear the action under the prior exclusive jurisdiction doctrine. This warrants dismissal or transfer of this action to the SDFL, the Court which first exercised jurisdiction over the Skipper, and therefore a court in which the Government could have (and should have) brought its action against the Skipper, thus satisfying 28 U.S.C. §1404(a).[2]

With respect to the public and private transfer factors, they either weigh in favor of the Hoglan Claimants or are neutral. The first public interest factor, "the transferee's familiarity with the governing laws and the pendency of related actions in the transferee's forum" weighs in favor of the Hoglan Claimants because the SDFL is well-versed in admiralty and forfeiture actions, and the Hoglan Claimants' *in rem* action against the Skipper and five other vessels is already pending in that Court. The other public interest factors ("the relative congestion of the calendars of the potential transferee and transferor courts and the local interest in deciding local controversies at home") are neutral because both venues are busy federal courts and neither has a particular "local interest" in this case, which bears national implications for terror victims seeking to enforce judgments.

Similarly, the private interests either weigh in favor of the Hoglan Claimants or are neutral. Because the Hoglan Claimants were the first to seek and obtain an arrest warrant against

---

[2] Under 28 U.S.C. §§ 1355(b)(1) and 1395(c) and (d), the SDFL is the district where the Skipper had been "brought" and "arrested," and therefore is a proper venue for a forfeiture action against the vessel.

the Skipper, their choice of forum should be prioritized over the Government's, which both knew of the SDFL action and could have brought proceedings there. The other factors are neutral, as 1) neither party's claim arose in SDFL or this district; 2) both forums are equally convenient for the parties; 3) neither *in rem* action requires witnesses in the traditional sense; 4) neither *in rem* action requires access to sources of proof in the traditional sense.

Perhaps most importantly, "[a]nother significant factor present in this case is the interest of justice in avoiding duplicative litigation in different federal courts. In ruling on the pending motion to transfer, this Court may appropriately consider the 'conservation of judicial resources and comprehensive disposition of litigation'… Transfer of this case to the Southern District of Florida will permit that Court to consolidate the two actions and treat them as one." *Cronos Containers, Ltd. v. Amazon Lines, Ltd.*, 121 F. Supp. 2d 461, 466 (D. Md. 2000) (citing *Kerotest Manufacturing Co. v. C–O–Two Fire Equipment Co.,* 342 U.S. 180, 183 (1952)). For these reasons, this Court should dismiss or transfer this action in favor of the first-filed *in rem* proceeding in the Southern District of Florida.

Finally, under the prior exclusive jurisdiction argument, this Court should at the least transfer the proceedings to the SDFL for adjudication of all pending motions.  It would defeat the very purpose of the doctrine if a party could file in a second district and have its claims heard there in the guise of challenging jurisdiction of the district where an *in rem* proceeding was first filed. This argument has particular force here, where the Government was fully aware of the prior proceeding, and could have filed there, but chose not to do so.

**CONCLUSION**

The Hoglan Claimants' Motion to Dismiss or, in the Alternative, Transfer this action should be granted.

Dated: April 13, 2026

Respectfully submitted,

MITCHELL ALLYN, LTD.

 /s/ Douglass A. Mitchell
Douglass A. Mitchell
DDC Bar No. WI0029
Mitchell Allyn, Ltd.
1000 N. Green Valley Pkwy
Suite 440-575
Henderson, Nevada 89074
Phone: 702-350-1208
*Attorneys for the Hoglan Claimants*

17