**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

          Plaintiff,

    -v-

MOTOR TANKER *SKIPPER* BEARING
INTERNATIONAL MARITIME NUMBER
9304667, AND THE OIL CARGO
PREVIOUSLY LADEN THEREON,

          Defendant.

Civ. A. No. 26-697 (CJN)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
CLAIMANT WINDWARD SHIPMANAGEMENT CORP.'S MOTION TO DISMISS
AND MOTION TO SUPPRESS EVIDENCE OF THE CARGO**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................... 1

II.   FACTUAL BACKGROUND................................................................................... 3

III.  LEGAL STANDARD.............................................................................................. 5

IV.   ARGUMENT........................................................................................................... 7

      A.   The Complaint Fails to Adequately Plead a Lawful Basis for Exercising *In Rem* Jurisdiction Over a Foreign-Flagged Vessel Seized on the High Seas................... 7

           1.   There Is *In Rem* Jurisdiction Over Foreign-Flagged Vessels on the High Seas Only Under Certain Narrow Exceptions ............................................ 8

           2.   The Government Has Not Adequately Alleged Statelessness .................... 9

           3.   The Cited Jurisdictional Statutes Must Be Read in Harmony With International Law ...................................................................................... 11

      B.   This Court Is Not a Proper Venue........................................................................ 13

      C.   The Complaint Fails to State Sufficiently Detailed Facts to Support a Reasonable Belief the Government Will Be Able to Meet Its Burden of Proof at Trial.......... 15

      D.   The Cargo Must Be Suppressed Under Supplemental Rule G(8)(a) ................... 19

V.    CONCLUSION...................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................................................................6

*Carr v. United States*,
  560 U.S. 438 (2010)................................................................................................................18

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
  485 U.S. 568 (1988)................................................................................................................12

*INS v. St. Cyr*,
  533 U.S. 289 (2001)................................................................................................................12

*Johnson v. Deloitte Servs., LLP*,
  939 F. Supp. 2d 1 (D.D.C. 2013).............................................................................................7

*Luan v. United States*,
  722 F.3d 388 (D.C. Cir. 2013)..................................................................................................7

*Murray v. Schooner Charming Betsy*,
  6 U.S. (2 Cranch) 64 (1804)..............................................................................................11, 12

*Republic Nat'l Bank of Miami v. United States*,
  506 U.S. 80 (1992)................................................................................................................7, 8

*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011)................................................................................................18

*U.S. v. 40,000.00 in U.S. Currency*,
  No. 1:09-cv-383, 2010 WL 2330353 (W.D.N.C. May 11, 2010)..............................................6

*United States v. $639,558*,
  751 F. Supp. 6 (D.D.C. 1990), *aff'd sub nom. $639,558 In U.S. Currency*, 955
  F.2d 712 (D.C. Cir. 1992) .................................................................................................19, 20

*United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*,
  571 F. Supp. 2d 1 (D.D.C. 2008) .............................................................................................5

*United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*,
  No. CV 04-0798 (PLF), 2023 WL 5000213 (D.D.C. Aug. 4, 2023)........................................7

*United States v. Bustos-Guzman*,
  685 F.2d 1278 (11th Cir. 1982) (per curiam)...........................................................................10

*United States v. Flores*,
  289 U.S. 137 (1933).....................................................................................................................12

*United States v. Funds From Prudential Sec.*,
  362 F. Supp. 2d 75 (D.D.C. 2005) ...............................................................................................6

*\*United States v. Hsin-Yung*,
  97 F. Supp. 2d 24 (D.D.C. 2000) ..................................................................................................8

*United States v. Louisiana*,
  394 U.S. 11 (1969)........................................................................................................................8

*\*United States v. Marino-Garcia*,
  679 F.2d 1373 (11th Cir. 1982) ...............................................................................................8, 9

*United States v. Matos-Luchi*,
  627 F.3d 1 (1st Cir. 2010).............................................................................................................10

*\*United States v. Oil Tanker Bearing Int'l Mar. Org. No. 9116512*,
  480 F. Supp. 3d 39 (D.D.C. 2020) ..............................................................................................16

*United States v. One 1974 Cessna Model 310R Aircraft, Serial No. 310R0203,*
  *FAA Registration No. N5083J*,
  432 F. Supp. 364 (D.S.C. 1977)...................................................................................................14

*United States v. One Gulfstream G-V Jet Aircraft*,
  941 F. Supp. 2d 1 (D.D.C. 2013) ..................................................................................................6

*United States v. Six Hundred Thirty-Nine Thousand Five Hundred & Fifty-Eight*
  *Dollars ($639,558) In U.S. Currency*,
  955 F.2d 712 (D.C. Cir. 1992) .....................................................................................................19

**Statutes**

14 U.S.C. § 522(a) .........................................................................................................................11

*\*18 U.S.C. § 981(a)(1)(G)(i) ............................................................................................... passim*

18 U.S.C. § 981(f)...........................................................................................................................18

18 U.S.C. § 981(b)(2) .....................................................................................................................19

18 U.S.C. § 981(b)(2)(A).................................................................................................................20

18 U.S.C. § 981(b)(2)(B).................................................................................................................20

18 U.S.C. § 981(b)(2)(C) ...................................................................................................................20

18 U.S.C. § 983(a)(3)(A) .....................................................................................................................6

*18 U.S.C. § 2232(b) .........................................................................................................................17

18 U.S.C. § 2332b(g)(5) ......................................................................................................................5

*18 U.S.C. § 2339B ...........................................................................................................................17

*28 U.S.C. § 1355(b)(1) ....................................................................................................................14

*28 U.S.C. § 1355(b)(2) ....................................................................................................................13

28 U.S.C. § 1355(d) ...........................................................................................................................14

*28 U.S.C. § 1395(c) ......................................................................................................................2, 14

28 U.S.C. § 2461(b) ...........................................................................................................................11

*46 U.S.C. § 70502(d)(1) ...................................................................................................................10

**Rules**

Federal Rule of Civil Procedure 8(a) ...................................................................................................6

Federal Rule of Civil Procedure 12(b)(2) ........................................................................................1, 7

Federal Rule of Civil Procedure 12(b)(3) ........................................................................................1, 7

Federal Rule of Civil Procedure 12(b)(6) ...........................................................................................1

*Supplemental Rule G(2)(b).........................................................................................................13, 14

*Supplemental Rule G(2)(f) ...................................................................................................... *passim*

*Supplemental Rule G(8)(a) ..............................................................................................................19

Pursuant to Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions and Federal Rules of Civil Procedure 12(b)(2), 12(b)(3), and 12(b)(6), Claimant Windward Shipmanagement Corp. ("Windward") submits this Memorandum of Points and Authorities in support of its Motion to Dismiss the Complaint and for suppression of certain seized material.

## I.    INTRODUCTION

In this action, the Government seeks forfeiture of the MOTOR TANKER *SKIPPER* BEARING INTERNATIONAL MARITIME NUMBER 9304667 (the "*Skipper*"), a vessel owned by Windward that was seized by the United States on the high seas off the coast of Venezuela in December 2025.  Yet the Government's Complaint lacks detailed allegations commensurate with the drastic remedy of civil forfeiture it seeks.  In several respects, all of which are fatal to the Government's claim, the Complaint falls well short of the heightened pleading standard applicable to civil forfeiture actions.  For the reasons stated below, this Court should dismiss the Government's forfeiture action.

***First,*** the Complaint fails to adequately plead a lawful basis for exercising *in rem* jurisdiction over the *Skipper*, a foreign-flagged vessel seized on the high seas hundreds of miles from the United States.  The Government's case for *in rem* jurisdiction rests on its allegation that the *Skipper* is a stateless vessel and therefore subject to U.S. jurisdiction.  But the Government does not even attempt to allege any of the statutory bases for statelessness.  Instead, the Government relies exclusively on one unspecified, hearsay assertion allegedly from the U.S. embassy in Guyana that the *Skipper* was flying a false Guyanese flag.  Nothing more.  Thus, the allegation of statelessness is inadequately pleaded by any measure, much less the heightened pleading standard applicable here.

1

*Second,* the Complaint fails to allege a basis for venue in this District.  The only venue statute the Government cites, by its plain language, has no application to seizures by the United States on the high seas; rather, it applies to seizures within a foreign country.  Again, the *Skipper* was seized off the coast of Venezuela, hundreds of miles from U.S. soil.  Nor does any other statute provide a basis for venue in this District.  To the contrary, the statute that does prescribe the appropriate venue for property seized outside any judicial district (28 U.S.C. § 1395(c)) provides that venue is appropriate in the district where the vessel has been brought, which is the Southern District of Texas and undisputedly not this District.

*Third,* on the merits, the Government fails to meet the heightened pleading standard for civil forfeiture.  The Government's theory that the *Skipper* is subject to forfeiture because it affords "sources of influence" over two designated foreign terrorist organizations, the Islamic Revolutionary Guard Corps ("IRGC") and the IRGC Quds Force ("IRGC-QF"), merely because the vessel is alleged to have transferred oil at Iranian ports.  This theory is attenuated and lacks adequate factual support in the Government's allegations.  Furthermore, the Government's claim is directly contradicted by the Executive Branch's own recent actions and proclamations about Iranian oil.

*Fourth,* and finally, to the extent the Government's allegations concerning the *Skipper* are based on the petroleum cargo it seized along with the vessel, the cargo must be suppressed as evidence.  As previously noted, Windward is not contesting the forfeiture of the petroleum cargo.  But by its own admission, the Government lacked a warrant with respect to the cargo when it was seized, and none of the exceptions to the warrant requirement were alleged or apply.  Under black-letter Fourth Amendment and forfeiture law, the cargo must be suppressed absent a pleaded and

2

proven exception—which the Complaint plainly lacks.  With the suppression of the *Skipper*'s cargo, the Complaint's already insufficient pleadings further deteriorate.

Accordingly, Windward respectfully requests that the Court dismiss the Complaint with respect to the *Skipper*.

## II.    FACTUAL BACKGROUND

Windward is a ship-owning corporation registered in the Seychelles that has owned the *Skipper* continuously since August 2024.  *See* Compl. ¶ 27.  On December 10, 2025, the Government seized the *Skipper* on the high seas.  *Id.* ¶ 47.  At the time of seizure, the *Skipper* "was laden with approximately 1,894,377 barrels of Venezuelan petroleum cargo."  *Id.* ¶ 2.  The Government seized the *Skipper* pursuant to a warrant issued on November 26, 2025, by a magistrate judge in this District.  *See* Dkt. 9-5.  However, the Government did not have a warrant for the seizure of the vessel's petroleum cargo at that time.  Compl. ¶ 2.

The *Skipper* remains in the Government's possession.  The Government does not allege the vessel's current location, but news reports indicate that the United States brought the *Skipper* to Galveston, Texas approximately eight days after its seizure, where it remains approximately four months later.[1]

At the time of its seizure, the *Skipper* flew the flag of Guyana.  Compl. ¶ 28.  However, the Government alleges that "according to information provided by the U.S. Embassy in Georgetown, Guyana, the vessel is not legitimately flagged in Guyana."  *Id.*  Thus, according to the Government, the vessel "is flying a false Guyanese flag and is considered stateless."  *Id.*  The Complaint further alleges that "several news organizations reported that an unauthorized entity was falsely

---

[1] *See, e.g.*, J. Gross and G. Glatsky, *What We Know About U.S. Seizures of Oil Tankers*, N.Y. TIMES, Jan. 8, 2026, https://www.nytimes.com/article/trump-oil-tankers-venezuela.html.

registering Iran-linked vessels under the Guyana flag as an obfuscation tactic." *Id.* ¶ 29. The Government makes no further allegations—and describes no documentary evidence—to support its claim that the *Skipper* is stateless, which is the sole factual predicate the Government invokes to justify both its high-seas seizure and this Court's exercise of forfeiture jurisdiction.

The Government filed the Complaint for civil forfeiture of the *Skipper* and its petroleum cargo on February 26, 2026. The Complaint alleges that the *Skipper* was observed loading or offloading oil in the vicinity of Iran's Kharg Island or Larak Island on several occasions in the last two years. Compl. ¶¶ 40-48. The Complaint also alleges that an unidentified "data and analytics company" reports that the *Skipper* "exhibited multiple [Automatic Identification System] spoofing incidents between 2024 and 2025." Compl. ¶ 31. According to the Complaint, the *Skipper* is a "ghost tanker for Iran." Compl. ¶ 49.

However, the Complaint does not allege that Iran or any entity affiliated with Iran owns the *Skipper*. To the contrary, the Complaint acknowledges the *Skipper* is owned by Windward. Compl. ¶ 27. Nor does the Complaint allege any affiliation between Windward and Iran or any Iranian entity, or details of any transaction or communication between the *Skipper* or Windward and the Iranian government or any Iranian entity. Indeed, Windward is a Seychelles-registered entity. Critically, as described in more detail below, the Complaint's fundamental logical leap— that carrying Iranian cargo is the equivalent of a source of influence over the IRGC or IRGC-QF— has been fatally undermined by the recent assertions and actions of the very same Executive Branch that filed the Complaint: the Government has now ***expressly licensed*** the international sale of Iranian oil, an action that would be illegal under multiple statutes were the shipment of Iranian oil necessarily the equivalent of providing a means of support to the IRGC or IRGC-QF. Further, the Complaint acknowledges the *Skipper* also carries "non-Iranian freight loads," but alleges that

4

such cargo "help[s] conceal the SKIPPER's primary role as an Iranian ghost fleet tanker, by providing a patina of non-Iranian activities that the SKIPPER i[s] engaged in."  Compl. ¶ 50 (emphasis removed).  However, the Government pleads no facts to support its assertion that the *Skipper* carrying non-Iranian oil is for the purpose of hiding its true role.

The Complaint does not allege any nexus of the *Skipper*'s activities to the District of Columbia or the United States of any kind.  It does not allege any involvement of U.S. persons, U.S. financial institutions, or U.S. currency in the *Skipper*'s activities.

The Complaint asserts a single claim for forfeiture of the *Skipper* and its petroleum cargo pursuant to 18 U.S.C. § 981(a)(1)(G)(i). Compl. ¶¶ 51-53.  The Complaint alleges the vessel and its cargo are subject to forfeiture under the statute because they "afford[] persons (including, without limitation, [the National Iranian Oil Company, the Iranian Oil Terminals Company, the National Iranian South Oil Company, and] Windward) sources of influence over the IRGC, including the IRGC-QF."  *Id.* ¶ 53.  The IRGC and IRGC-QF are designated foreign terrorist organizations under Section 219 of the Immigration and Nationality Act and are alleged to have engaged in planning and perpetrating federal crimes of terrorism as defined in 18 U.S.C. § 2332b(g)(5).  *Id.* ¶¶ 17, 53.

## III.   LEGAL STANDARD

A civil asset forfeiture complaint is subject to a "higher standard of pleading" than a typical civil action.  *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 571 F. Supp. 2d 1, 16 (D.D.C. 2008).  "Because civil forfeiture *in rem* provides the government with a powerful tool to effectuate an immediate deprivation of property . . . pleading requirements under the Supplemental Rules are more stringent than the general pleading requirements found in the Federal

Rules of Civil Procedure." *U.S. v. 40,000.00 in U.S. Currency*, No. 1:09-cv-383, 2010 WL 2330353, at *2 (W.D.N.C. May 11, 2010).

Most civil actions are subject to the familiar "notice pleading" standard embodied by Federal Rule of Civil Procedure 8(a), under which "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). However, the pleading requirements for civil asset forfeiture actions are set forth in the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (the "Supplemental Rules").   18 U.S.C. § 983(a)(3)(A).   Under Supplemental Rule G(2)(f), the complaint in a civil forfeiture action must "state sufficiently detailed facts to support a reasonable belief that the Government will be able to meet its burden of proof at trial."  Supp. R. G(2)(f).

Whereas *Iqbal* requires mere facial plausibility and does not impose a "probability requirement," *Iqbal*, 556 U.S. at 678, Supplemental Rule G(2)(f) requires that the Government plead facts giving rise to a "reasonable belief" that the Government will prevail.  Supp. R. G(2)(f). This is a "heightened particularity requirement . . . designed to guard against the improper use of seizure proceedings and to protect property owners against the threat of seizure upon conclusory allegations." *United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 14 (D.D.C. 2013) (granting motion to dismiss asset forfeiture complaint where government failed to substantiate allegation that defendant property is derived from or traceable to illicit activity).

In a civil asset forfeiture action, the Government ultimately bears the burden of establishing, by a preponderance of the evidence, that the property is subject to forfeiture. *See United States v. Funds From Prudential Sec.*, 362 F. Supp. 2d 75, 80-81 (D.D.C. 2005) (citing 18 U.S.C. § 983(c)).  Specifically, here, the Government must sufficiently allege that the *Skipper*

6

"afford[s] any person a source of influence over" an "individual, entity, or organization engaged in planning or perpetrating any Federal crime of terrorism (as defined in [18 U.S.C. §] 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property," pursuant to 18 U.S.C. § 981(a)(1)(G)(i).

In considering a motion to dismiss for improper venue under Rule 12(b)(3), "the court accepts the plaintiff's well-pled factual allegations regarding venue as true, draws all reasonable inferences from those allegations in the plaintiff's favor, and resolves any factual conflicts in the plaintiff's favor." *Johnson v. Deloitte Servs., LLP*, 939 F. Supp. 2d 1, 3 (D.D.C. 2013) (citation omitted). "The court may consider material outside of the pleadings," and "[b]ecause it is the plaintiff's obligation to institute the action in a permissible forum, the plaintiff usually bears the burden of establishing that venue is proper." *Id.* (citations omitted). "Unless there are pertinent factual disputes to resolve, a challenge to venue presents a pure question of law." *Id.* (citation omitted).

## IV.    ARGUMENT

### A.    The Complaint Fails to Adequately Plead a Lawful Basis for Exercising *In Rem* Jurisdiction Over a Foreign-Flagged Vessel Seized on the High Seas

In a civil forfeiture case, the property the Government seeks to forfeit is a party to the litigation. The Court therefore must have *in rem* jurisdiction over that property. *Luan v. United States*, 722 F.3d 388, 397, 399 & n.15 (D.C. Cir. 2013); *see United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, No. CV 04-0798 (PLF), 2023 WL 5000213, at *18 (D.D.C. Aug. 4, 2023) ("'Although Rule 12(b)(2) only refers to "lack of personal jurisdiction," the provision presumably is sufficiently elastic to embrace a defense or objection that the district court lacks in rem or quasi-in-rem jurisdiction'" (quoting 5B Wright & Miller, Federal Practice and Procedure § 1351 (3d ed. 2023))). *In rem* jurisdiction is established through the valid seizure of the *res*.

7

*Republic Nat'l Bank of Miami v. United States*, 506 U.S. 80, 84 (1992) ("[A] valid seizure of the *res* is a prerequisite to the initiation of an *in rem* civil forfeiture proceeding."); *Est. of Levin v. Wells Fargo Bank, N.A.*, 156 F.4th 632, 642 (D.C. Cir. 2025) (same).  Even at the pleading stage, a civil asset forfeiture complaint must "state the grounds for . . . in rem jurisdiction over the defendant property."  Supp. R. G(2)(b).

### 1.    There Is *In Rem* Jurisdiction Over Foreign-Flagged Vessels on the High Seas Only Under Certain Narrow Exceptions

The United States seized the *res*—the *Skipper*—on the high seas hundreds of miles from the United States.  Compl. ¶ 47.  The high seas are "international waters not subject to the dominion of any single nation."  *United States v. Louisiana*, 394 U.S. 11, 23 (1969).  The *Skipper* flies the flag of Guyana.  Compl. ¶ 28.  Under international law, foreign-flagged vessels on the high seas "are normally considered within the exclusive jurisdiction of the country whose flag they fly." *United States v. Marino-Garcia*, 679 F.2d 1373, 1380 (11th Cir. 1982); *see* United Nations Convention on the Law of the Sea, Art. 92(1), Dec. 10, 1982, 1833 U.N.T.S. 397 (reflecting customary international law that "[s]hips shall sail under the flag of one State only, and save in exceptional cases expressly provided for in international treaties or in this Convention, shall be subject to its exclusive jurisdiction on the high seas").  However, consistent with international law, U.S. courts have established a limited set of exceptions under which the United States may exercise jurisdiction over a foreign-flagged vessel on the high seas.  Those exceptions include where the vessel is engaged in certain universally prohibited activities, such as piracy or the slave trade; or where the vessel is stateless.  *Marino-Garcia*, 679 F.2d at 1381–83.  Vessels that falsely claim nationality are considered stateless.  *United States v. Hsin-Yung*, 97 F. Supp. 2d 24, 27 (D.D.C. 2000).  Such vessels are "international pariahs" with "no internationally recognized right to navigate freely on the high seas," and are therefore subject to the jurisdiction of any nation,

8

including the United States. *See Marino-Garcia*, 679 F.2d at 1382 (citing Convention on the High Seas, Art. 6, Apr. 29, 1958).

### 2.      The Government Has Not Adequately Alleged Statelessness

The only allegation the Government has offered that might subject the foreign-flagged *Skipper* to the jurisdiction of the United States and thereby authorize the seizure of the vessel on the high seas is that the *Skipper* is stateless. *See* Compl. ¶ 28. But the Government fails to adequately allege facts to substantiate this allegation. Rather, the Government merely alleges that the *Skipper* "flies the flag of Guyana, but ***according to information provided by the U.S. Embassy in Georgetown, Guyana,*** the vessel is not legitimately flagged in Guyana. Thus, it is flying a false Guyanese flag and is considered stateless." *Id.* (emphasis added).[2] The Government obscures the source of this unspecified hearsay "provided by the U.S. Embassy," and provides no documentary support to corroborate its allegation. It offers no indication of what actual information was allegedly shared or by whom, nor any records that would suggest a basis to conclude that this unnamed person accurately arrived at the conclusion that the *Skipper* is stateless. In other words, the Government asks this Court to order an extraordinary remedy—the forfeiture of an oil tanker owned by an entity that has *nothing* to do with Iran—based solely on an unsupported, naked hearsay allegation from the U.S. Embassy in Guyana. The Court should reject this improper invitation.

Moreover, the Government's allegation that the U.S. Embassy provided information regarding the *Skipper*'s alleged statelessness does not comport with what is required to establish

---

[2] The additional broad circumstantial allegation that news reports suggest an unspecified "unauthorized entity" was "falsely registering Iran-linked vessels under the Guyana flag," Compl. ¶ 29, plainly does not satisfy any of the criteria to establish statelessness discussed *infra*, much less meet the heightened pleading standard under Supplemental Rule G(2)(f).

9

that a vessel is stateless under U.S. or international law.  The Maritime Drug Law Enforcement

Act defines a "vessel without nationality" as follows:

> (A) a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed;
>
> (B) a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel;
>
> (C) a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality; and
>
> (D) a vessel aboard which no individual, on request of an officer of the United States authorized to enforce applicable provisions of United States law, claims to be the master or is identified as the individual in charge, and that has no other claim of nationality or registry under paragraph (1) or (2) of subsection (e).

46 U.S.C. § 70502(d)(1).  This definition is consistent with longstanding principles of international

law, which holds that flying a flag is "prima facie proof" of nationality that may be rebutted when

similar conditions are met.  *United States v. Bustos-Guzman*, 685 F.2d 1278, 1280 (11th Cir. 1982)

(per curiam); *see generally United States v. Matos-Luchi*, 627 F.3d 1, 5-7 (1st Cir. 2010).

The Government does not allege any of the criteria necessary to establish statelessness to

justify the seizure.  Rather, its only allegation is that the *Skipper* is not legitimately flagged

"according to information provided by the U.S. Embassy."  But the Government offers no

information about who provided this information, how they learned it, or their qualifications to

discern it.  These allegations fall well short of the Government's heightened pleading standard

under Supplemental Rule G(2)(f): the Government has not alleged "sufficiently detailed facts to

10

support a reasonable belief" that it will be able to meet its burden of proof at trial that the seizure of the *Skipper* was valid such that it can establish *in rem* jurisdiction over the *Skipper*.[3]

### 3. The Cited Jurisdictional Statutes Must Be Read in Harmony With International Law

Lastly, to the extent the Government seeks to argue that jurisdictional statutes provide *in rem* jurisdiction over foreign-flagged vessels on the high seas absent statelessness or other narrow enumerated exceptions, it is incorrect. The statutory framework must be understood against the background international law proposition that vessels on the high seas are subject to the exclusive jurisdiction of the flag state, subject only to narrow exceptions. *See supra* at 8-9. The *Charming Betsy* canon has long instructed that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804); Restatement (Third) of the Foreign Relations Law of the United States, § 115 cmt. a (1987) ("It is generally assumed that Congress does not intend to repudiate an international obligation . . . .").

The *Charming Betsy* canon applies with particular force here to the extent the Government seeks to construe statutes to authorize a seizure on the high seas that is contrary to international law. *See, e.g.*, 14 U.S.C. § 522(a) (authorizing Coast Guard seizures on the high seas only as to a "vessel subject to the jurisdiction, or to the operation of any law, of the United States"); 28 U.S.C. § 2461(b) (providing a "mode of recovery" for forfeitures when a seizure occurs "on the high

---

[3] Indeed, given the purported provenance of the "information" regarding the Guyanese flag, Windward anticipates that the Government may compound its failures in pleading by invoking state secret and other diplomatic privileges regarding communications with the U.S. Embassy or foreign diplomatic partners, erasing any possible relevance of this hearsay. While the Court is well positioned to dismiss this Complaint even without striking the allegation of the U.S. Embassy's hearsay, the Government should not be permitted to rely *at all* on that allegation in defending the Complaint without expressly disclaiming any intent to rely on state secret or diplomatic privileges to shield the disclosure of the "information" purportedly provided through diplomatic channels.

11

seas"). Read in harmony with *Charming Betsy*, those provisions cannot be taken to confer a general power to seize a foreign-flag vessel on the high seas absent a pleaded and provable basis that international law recognizes—to wit, valid statelessness.[4]

For all of these reasons, the Complaint must be dismissed for failure to adequately allege *in rem* jurisdiction over the *Skipper*.[5]

---

[4] A narrow construction also avoids a substantial Article I question. Congress possesses enumerated authority "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." U.S. Const. art. I, § 8, cl. 10. Congress has broader authority over U.S. vessels and U.S. nationals, as reflected in *United States v. Flores*, 289 U.S. 137 (1933), which rejected the contention that Article I's "define and punish" clause limited the separate grant of admiralty and maritime authority in a case involving the prosecution of a U.S. citizen for homicide aboard an American vessel in foreign territorial waters. Here, however, the Government seeks to use a civil forfeiture theory to justify a high-seas seizure of a vessel owned by a foreign company and alleged to be operating outside U.S. territory, without any pleaded U.S. nexus other than an attenuated "source of influence" theory under 18 U.S.C. § 981(a)(1)(G)(i). Compl. ¶¶ 2, 27–28, 47, 53. The Court should therefore construe the relevant statutes not to authorize such an extraterritorial seizure absent a pleaded and provable jurisdictional predicate recognized by international law, thereby avoiding serious constitutional questions. *See INS v. St. Cyr*, 533 U.S. 289, 299–300 (2001) (Under the constitutional-avoidance canon, "if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute 'is fairly possible,'" the statute should be construed "to avoid such problems.") (internal citations omitted); *see also Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("This approach not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that Congress, like this Court, is bound by and swears an oath to uphold the Constitution. The courts will therefore not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it.").

[5] Publicly available information suggests the Government may be able to meet its burden regarding statelessness if given the opportunity to amend the Complaint. *See Crude Oil Tanker Falsely Flying the Guyana Flag*, Guyana Dep't of Public Information, https://dpi.gov.gy/crude-oil-tanker-falsely-flying-the-guyana-flag/ (last visited April 13, 2026).

### B.    This Court Is Not a Proper Venue

The Government's own allegations make plain that this District is not a proper venue for this *in rem* action against the *Skipper*.  Rather, to the extent there is a proper venue, it is the Southern District of Texas, where the Government chose to bring the *Skipper* after it was unlawfully seized.[6]

Supplemental Rule G(2)(b) requires a plaintiff to allege "grounds for . . . venue."  The Government attempts to satisfy this requirement by alleging that "[v]enue is . . . proper within this judicial district pursuant to 28 U.S.C. § 1355(b)(2)."  Compl. ¶ 4.  But by its plain terms, Section 1355(b)(2) has no application here.  The statute provides:

> Whenever property subject to forfeiture under the laws of the United States is located in a foreign country, or has been detained or seized pursuant to legal process or competent authority of a foreign government, an action or proceeding for forfeiture may be brought as provided in paragraph (1), or in the United States District court for the District of Columbia.

28 U.S.C. § 1355(b)(2) (emphasis added).  It is undisputed that the *Skipper* is neither "located in a foreign country," nor has it been "detained or seized pursuant to legal process or competent authority of a foreign government."  Rather, the *Skipper* was seized on the high seas by the United States and is not alleged to be located in a foreign country.  *See* Compl. ¶ 47.  Congress could have written Section 1355(b)(2) to encompass high-seas seizures by the United States but chose not to do so.  This Court should not improperly expand the breadth of the statute beyond its plain meaning.

---

[6] The "Hoglan Claimants" contend that another federal district court first asserted *in rem* jurisdiction over the *Skipper*.  *See* Dkt. 26.  Windward reserves its rights with respect to the arguments set forth in the Hoglan Claimants' motion, but regardless of the merits of that dispute, it underscores why this Court is not the proper forum for this action.

There is, in fact, a statute that establishes a proper venue for forfeiture proceedings with respect to vessels seized on the high seas, and it makes plain that venue is not proper in this District. Under 28 U.S.C. § 1355(b)(1), "[a] forfeiture action or proceeding may be brought in—(A) the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred, or (B) any other district where venue for the forfeiture action or proceeding is specifically provided for in section 1395 of this title or any other statute."  28 U.S.C. § 1395(c), in turn, provides that "[a] civil proceeding for the forfeiture of property *seized outside any judicial district* may be prosecuted in *any district into which the property is brought*" (emphases added).  A vessel seized on the high seas is property seized "outside any judicial district" within the meaning of Section 1395(c).  *See, e.g.*, *United States v. One 1974 Cessna Model 310R Aircraft, Serial No. 310R0203, FAA Registration No. N5083J*, 432 F. Supp. 364, 368 (D.S.C. 1977) (Section 1395(c) "properly applies procedures made outside the territorial limits of the United States, such as a seizure on the high seas").

Here, with respect to Section 1355(b)(1)(A), the Complaint is devoid of any allegation that any "acts or omissions giving rise to the forfeiture occurred" in this District.  Nor, for purposes of Section 1395(c), does the Complaint contain any allegation regarding the district where the *Skipper* was brought.  However, public reporting indicates the United States brought the *Skipper* to Galveston, Texas after it was seized.[7]  Thus, if the reporting is correct, the proper venue for this action pursuant to 28 U.S.C. § 1395(c) would be the Southern District of Texas—not this District.[8]

---

[7] *See, e.g.*, J. Gross and G. Glatsky, *What We Know About U.S. Seizures of Oil Tankers*, N.Y. TIMES, Jan. 8, 2026, https://www.nytimes.com/article/trump-oil-tankers-venezuela.html.

[8] Nor may the Government cure this defect by requesting that the Court issue "such process as may be required to bring before the court the property that is the subject of the forfeiture action" pursuant to 28 U.S.C. § 1355(d), as this requires that the Court have "jurisdiction over [the] forfeiture action pursuant to subsection (b)."  28 U.S.C. § 1355(d).

14

Accordingly, because the Government has failed to adequately allege "grounds for . . . venue" as required by Supplemental Rule G(2)(b), the Complaint must be dismissed.

**C.** **The Complaint Fails to State Sufficiently Detailed Facts to Support a Reasonable Belief the Government Will Be Able to Meet Its Burden of Proof at Trial**

On the merits, the Complaint fails to meet the Government's heightened pleading burden under Supplemental Rule G(2)(f) to "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."  Fed. R. Civ. P. G(2)(f).  The Government's attenuated theory holds that because the *Skipper* is alleged to have transferred Iranian oil at some point in the past, the vessel itself "affords persons . . . sources of influence over the IRGC, including the IRGC-QF" pursuant to 18 U.S.C. § 981(a)(1)(G)(i).  Compl. ¶ 53.  But the Complaint never explains how the *Skipper*'s alleged commercial activity translated into influence over the IRGC's conduct, priorities, or terrorist operations—rather than merely into generalized revenue for the unnamed seller of those historical cargos.

The statute cited by the Government, 18 U.S.C. § 981(a)(1)(G)(i), provides that property is "subject to forfeiture to the United States" if it is an asset

> of any individual, entity, or organization engaged in planning or perpetrating any Federal crime of terrorism (as defined in section 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property, and all assets, foreign or domestic, affording any person a source of influence over any such entity or organization[.]

Here, the *Skipper* is not alleged to be the "property" of the IRGC or the IRGC-QF (understandably so, as it is the property of Windward).  Rather, the Government alleges only that the vessel affords "persons (including, without limitation, NIOC, IOTC, NISOC, [and] Windward) sources of influence over the IRGC, including the IRGC-QF."  Compl. ¶ 53.  There is little caselaw interpreting what qualifies as "affording any person a source of influence over" a terrorist organization pursuant to 18 U.S.C. § 981(a)(1)(G)(i), but courts have generally looked to cases

applying a similar provision in the Racketeer Influenced and Corrupt Organizations Act (RICO), under which courts determine whether the property is "used to further the affairs of the enterprise" or makes "the prohibited conduct less difficult." *See United States v. Oil Tanker Bearing Int'l Mar. Org. No. 9116512*, 480 F. Supp. 3d 39, 46 (D.D.C. 2020).

The Government has not stated sufficiently detailed facts to support a reasonable belief that it can prove at trial that the *Skipper* was, at the time or its seizure or, indeed, at *any* point, used to further the affairs of the IRGC or IRGC-QF or made any prohibited conduct less difficult. Rather, the Government alleges only that the *Skipper* loaded or delivered oil at or around Kharg Island or Larak Island, Iran. Compl. ¶¶ 40-46. The Government offers no details about the purposes of the loading or delivering of oil, the party who benefited from the alleged activity, or any other facts that might corroborate the connection between the *Skipper* and the IRGC or IRGC-QF. The Government's broad and conclusory allegation that the *Skipper* "transport[ed] Iranian petrochemical products to generate revenue for the IRGC" (Compl. ¶ 1) is not supported by details of any transactions or allegations that the *Skipper* had any dealings whatsoever with the IRGC or IRGC-QF. Nor has the Government alleged in any detail how any property or revenues connected to the *Skipper* were at the time of its seizure, or any time prior to that point, used to further the affairs of the IRGC or IRGC-QF. In sum, the Government simply argues that because the Skipper at one point allegedly was loaded with oil in Iran, it is therefore a tool of the IRGC or IRGC-QF. These bald and conclusory allegations cannot satisfy the Government's heightened pleading burden under Supplemental Rule G(2)(f).

Indeed, the Government's attenuated allegation that merely transporting oil from Iranian ports renders the *Skipper* a "source of influence" over the IRGC or IRGC-QF is ***directly contradicted*** by the Government's own recent actions and public pronouncements. Specifically,

16

on March 20, 2026, the Treasury Department's Office of Foreign Assets Control (OFAC) issued a General License under which "the sale, delivery, or offloading of crude oil or petroleum products of Iranian origin loaded on any vessel" was ***expressly authorized by OFAC*** for a period of 30 days.[9]  That same day, Treasury Secretary Scott Bessent posted a statement regarding the General License on X.com, stating in part:

> Today, the Department of the Treasury is issuing a narrowly tailored, short-term authorization permitting the sale of Iranian oil currently stranded at sea.

> At present, sanctioned Iranian oil is being hoarded by China on the cheap. By temporarily unlocking this existing supply for the world, the United States will quickly bring approximately 140 million barrels of oil to global markets, expanding the amount of worldwide energy and helping to relieve the temporary pressures on supply caused by Iran. In essence, we will be using the Iranian barrels against Tehran to keep the price down as we continue Operation Epic Fury.[10]

If mere transportation and sale of oil of Iranian origin constituted in itself a "source of influence" over the IRGC or IRGC-QF, as the Government contends in this proceeding, then OFAC's March 20 General License ***would be illegal*** under 18 U.S.C. § 2232(b), which prohibits the transfer of property "subject to the in rem jurisdiction of a United States court for purposes of civil forfeiture"; and would impermissibly legalize "[p]roviding material support or resources to designated foreign terrorist organizations" pursuant to 18 U.S.C. § 2339B.  *See* 18 U.S.C. § 2232(b); 18 U.S.C. § 2339B.  The United States, through an Executive branch licensing decision, cannot have authorized providing material support to designated foreign terrorist organizations in violation of these statutes, nor has the Government ever cited any authority that would permit it to do so.  Accordingly, while the Government asserts in this case that loading oil in Iran is, *ipso facto*,

---

[9] Office of Foreign Assets Control, General License U, Authorizing the Delivery and Sale of Crude Oil and Petroleum Products of Iranian-Origin Loaded on Vessels as of March 20, 2026, *available at* https://ofac.treasury.gov/media/935376/download?inline.

[10] Scott Bessent, X, Mar. 20, 2026, https://x.com/SecScottBessent/status/2035131840604881359.

sufficient reason to seize the *Skipper*, the Executive Branch itself has made clear that the mere act of transporting oil of Iranian origin ***cannot*** on its own constitute a "source of influence" over the IRGC or IRGC-QF pursuant to 18 U.S.C. § 981(a)(1)(G)(i).  If the Court were to accept the Government's position in this case, it would constitute a finding that actions taken by the U.S. Treasury Department within the last month were themselves illegal.  That cannot be what the Government intended in its recent licensing actions, and the proper route for reconciling this situation is to acknowledge that the Government's allegations rely on a faulty and unsupported leap in logic—a premise recently rejected by the very Executive Branch that is pursuing this action. This Court can and should reject the Government's illegal and unfounded forfeiture of the *Skipper*.

Finally, even if mere transportation and sale of oil of Iranian origin ***were*** sufficient to constitute a "source of influence" over the IRGC or IRGC-QF—which it is not—the Complaint still fails to satisfy 18 U.S.C. § 981(a)(1)(G)(i)'s requirement that the defendant property be an asset "affording any person a source of influence over" a terrorist organization.  18 U.S.C. § 981(a)(1)(G)(i).  Congress chose the present tense—"affording"—which strongly suggests the statute targets assets that provide such influence as of the relevant time, not assets that may have done so at some indeterminate point in the past.  *See Carr v. United States,* 560 U.S. 438, 448-49 (2010) (relying on Congress's use of the present tense to reject an interpretation that would sweep in prior conduct; noting that the Dictionary Act's "present tense include[s] the future" implies that "the present tense generally does not include the past"); *Sherley v. Sebelius*, 644 F.3d 388, 394 (D.C. Cir. 2011) (same).  The Government therefore must allege—with the specificity Rule G requires—facts showing that, as of the vessel's seizure (or other pleaded "act giving rise to forfeiture"), the Skipper was functioning as an asset that afforded anyone a "source of influence" over the IRGC or IRGC-QF.  *See* 18 U.S.C. § 981(a)(1)(G)(i), (f).  The Complaint does not do so:

18

it alleges only past port calls and generalized "ghost tanker" labels, without pleading facts plausibly connecting the *Skipper*'s status at the time of seizure to any **current** (or continuing) "source of influence" over the IRGC or IRGC-QF.

For all of the above reasons, the Government has failed to meet its heightened pleading burden and the Complaint is subject to dismissal on the merits.

### D.      The Cargo Must Be Suppressed Under Supplemental Rule G(8)(a)

Supplemental Rule G(8)(a) provides that "[i]f the defendant property was seized, a party with standing to contest the lawfulness of the seizure may move to suppress use of the property as evidence." *See United States v. $639,558*, 751 F. Supp. 6, 8 (D.D.C. 1990) ("The rule of suppression applies to forfeiture actions."), *aff'd sub nom. $639,558 In U.S. Currency*, 955 F.2d 712 (D.C. Cir. 1992).  Here, the petroleum cargo aboard the *Skipper* was seized unlawfully.  While it may have been a practical necessity for the Government to seize the cargo along with the vessel, to the extent the Government seeks to use that cargo as evidence to justify its forfeiture of the vessel and its cargo, it must be suppressed as evidence.[11]

The Government acknowledges that at the time it seized the *Skipper* and its petroleum cargo, it had obtained a warrant only for the seizure of the vessel itself: "at the time, a seizure warrant was not obtained" for the vessel's petroleum cargo.  Compl. ¶ 2.  Under the civil forfeiture statute, "[s]eizures pursuant to this section shall be made pursuant to a warrant obtained in the

---

[11] The cargo itself may still be subject to civil forfeiture, provided the Government can satisfy the required elements for civil forfeiture with respect to the cargo through independent, untainted evidence. *See United States v. Six Hundred Thirty-Nine Thousand Five Hundred & Fifty-Eight Dollars ($639,558) In U.S. Currency*, 955 F.2d 712, 715 (D.C. Cir. 1992) (while "illegally seized property . . . may not be relied upon to sustain a forfeiture . . . the fact that the defendant property had been seized after an illegal search does not 'immunize' it from forfeiture, any more than a defendant illegally arrested is immunized from prosecution" (citation and internal quotation marks omitted)). As noted, Windward is not contesting the forfeiture of the cargo itself.

19

same manner as provided for a search warrant under the Federal Rules of Criminal Procedure." 18 U.S.C. § 981(b)(2). While the statute provides exceptions to the warrant requirement, the Government does not (and cannot) allege any of those exceptions applied here when the petroleum cargo was seized on or about December 10, 2025. *See* 18 U.S.C. § 981(b)(2)(A) (exception to warrant requirement where "a complaint for forfeiture has been filed in the United States district court and the court issued an arrest warrant in rem pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims"); 18 U.S.C. § 981(b)(2)(B) (exception where "there is probable cause to believe that the property is subject to forfeiture and—(i) the seizure is made pursuant to a lawful arrest or search; or (ii) another exception to the Fourth Amendment warrant requirement would apply"); 18 U.S.C. § 981(b)(2)(C) (exception where "the property was lawfully seized by a State or local law enforcement agency and transferred to a Federal agency"). Thus, the cargo must be suppressed as evidence. *See, e.g.*, *$639,558*, 751 F. Supp. at 10 (where evidence in civil forfeiture action was found in connection with a warrantless search in violation of the Fourth Amendment, "the $639,558 and the accompanying evidence found as a consequence of that search must be suppressed"). As discussed above, the Government can only lawfully forfeit the *Skipper* if it pleads sufficiently detailed facts to support a reasonable belief that it can prove at trial that the *Skipper* was, at the time or its seizure or, indeed, at ***any*** point, used to further the affairs of the IRGC or IRGC-QF. The Court's analysis at this early stage must account for the fact that the cargo on board the Skipper should be suppressed and cannot be used by the Government in any future trial presentation.

Thus, to the extent the Government's forfeiture theory depends on evidence obtained from the unlawfully seized cargo, the Complaint cannot meet the pleading requirement of Rule G(2)(f).

20

## V.    CONCLUSION

The Complaint fails to adequately allege *in rem* jurisdiction, venue, or the merits of its civil forfeiture claim against the *Skipper*.  Further, the seized cargo must be suppressed as evidence. Accordingly, Windward respectfully requests that the Court dismiss the Complaint with respect to the *Skipper* and suppress the cargo as evidence.


Dated:  April 15, 2026

Respectfully Submitted,

By: */s/ Michael J. Baratz*

Michael J. Baratz, D.C. Bar No. 480607
**Steptoe LLP**
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000
Fax: (202) 429-3902
mbaratz@steptoe.com

Andrew C. Adams, N.Y. Bar No. 4727293
**Steptoe LLP**
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 506-3900
acadams@steptoe.com
Admitted *pro hac vice*

*Attorneys for Claimant Windward Shipmanagement Corp.*

21