UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civ. A. No. 1:26-cv-697 (CJN) |
| MOTOR TANKER SKIPPER BEARING INTERNATIONAL MARITIME NUMBER 9304667, AND THE OIL CARGO PREVIOUSLY LADEN THEREON, | ) ) ) ) ) | |
| Defendants *In Rem*. | ) ) | |

## GOVERNMENT'S OPPOSITION TO WINDWARD SHIPMANAGEMENT'S MOTION TO DISMISS AND MOTION TO SUPPRESS

The Government respectfully opposes Claimant Windward Shipmanagement's motion to dismiss this case and motion to suppress the SKIPPER's cargo as evidence.

### A. Windward's Arguments About *In Rem* Jurisdiction Are Meritless

Windward first argues that this Court lacks *in rem* jurisdiction. It essentially argues that the seizure of the SKIPPER would only be lawful if the SKIPPER were stateless, and that there are insufficient pled facts or evidence that the SKIPPER is stateless. Mot. at 7-12.

This argument fails out the gate because it assumes that a seizure of the SKIPPER is necessary to confer *in rem* jurisdiction for this civil forfeiture case. For most of U.S. legal history, that was indeed the rule. But with the 1992 amendments to 28 U.S.C. § 1355, Congress conferred jurisdiction on civil forfeiture courts even if the defendant property is located in a foreign country and thus cannot be seized or controlled by a U.S. court. The D.C. Circuit has confirmed this interpretation and the result of Section 1355—control of the property is no longer required. *United States v. All Funds in Acct. Nos. 747.034/278, 747.009/278, & 747.714/278 in Banco Espanol de*

*Credito, Spain*, 295 F.3d 23, 26-27 (D.C. Cir. 2002) ("*Banco Espanol*"). Under *Banco Espanol*, a seizure of the SKIPPER is irrelevant to *in rem* jurisdiction in this case.[1]

Moreover, even if a valid seizure of the SKIPPER *were* necessary to confer *in rem* jurisdiction, Windward concedes that the SKIPPER's seizure was valid if the SKIPPER were stateless. Mot. at 8. Windward merely argues that there are insufficient pled facts or evidence that the SKIPPER is stateless. But it is undisputed that the SKIPPER purports to fly the flag of Guyana, and Windward itself cites an official press release from the Guyanese government stating that the SKIPPER is "falsely flying the Guyana flag, as it is not registered in Guyana." https://dpi.gov.gy/crude-oil-tanker-falsely-flying-the-guyana-flag/ (cited in Mot. at 12 fn. 5). The Court may consider this press release when ruling on Windward's jurisdictional challenge. *See Sullivan v. LG Chem, Ltd.,* 79 F.4th 651, 660 (6th Cir. 2023) (recognizing that a plaintiff can demonstrate jurisdiction with affidavits and other evidence outside of the pleadings); *United States v. Smithfield Foods, Inc.*, 332 F. Supp. 2d 55, 59 (D.D.C. 2004) (unlike 12(b)(6) motions, jurisdictional motions do not limit the court to the four corners of the Complaint).

Given that the SKIPPER is falsely flying the Guyana flag, as confirmed by Guyana itself, the SKIPPER is stateless under any definition. Windward itself cites the definition of statelessness from the Maritime Drug Law Enforcement Act (MDLEA), which says that a stateless vessel

---

[1] Windward's cited cases (Mot. at 8) are not to the contrary. The first case, *Rep. Nat'l Bank of Miami v. United States*, 506 U.S. 80, 84 (1992), addressed the pre-1992 framework for civil forfeiture, where a seizure was indeed necessary for *in rem* jurisdiction. The second case, *Estate of Levin v. Wells Fargo Bank, N.A.*, 156 F.4th 632, 642 (D.C. Cir. 2025), held that the prior exclusive jurisdiction (PEJ) doctrine does not apply when the two relevant cases are venued in the same district. In explaining the rationale for the PEJ doctrine, *Levin* did talk about how *in rem* courts must seize property and how PEJ prevents unseemly situations where one court seizes the property from another court. This is an accurate description of the PEJ doctrine, and it is true that *in rem* cases generally and traditionally require a seizure of the *res*. But post-1992 civil forfeiture cases are an exception to this rule, as *Banco Espanol* held. And *Levin*'s brief, general tutorial on PEJ cannot possibly be read as an oblique or *sub rosa* overruling of *Banco Espanol*.

includes "a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed." Mot. at 10 (quoting 46 U.S.C. § 70502(d)(1)). The MDLEA also states that flying a country's flag qualifies as making a claim of registry. 46 U.S.C. § 70502(e)(2). Thus, the person or persons in charge of the SKIPPER are claiming Guyana registry by flying the Guyana flag, but Guyana has said that the SKIPPER is sailing under a false flag and is not registered in Guyana. This easily renders the SKIPPER stateless under the MDLEA definition that Windward relies on. It also renders the SKIPPER stateless under more general principles of law. For example, many years before the MDLEA, the Supreme Court held that a stateless vessel is simply a non-U.S. vessel that is "not lawfully sailing under the flag of any foreign nation." *United States v. Holmes*, 18 U.S. 412, 417 (1820). This perfectly describes the SKIPPER. Moreover, Windward itself admits that "[v]essels that falsely claim nationality are considered stateless" (Mot. at 8), and this perfectly describes the SKIPPER as well.

### B. Venue Is Proper in This District

There is no merit to Windward's next argument that venue is improper in this District. Mot. at 13-15. Initially, the Complaint pleads that the SKIPPER is "on the high seas." Complaint (Dkt. 1) at ¶ 5. And while Windward alleges based on "public reporting" that the SKIPPER has since been moved to Galveston, Texas, that is incorrect. Rather, the vessel is currently located outside U.S. territorial waters *near* Galveston, as explained in the attached Declaration. In any event, venue is assessed at the time of filing,[2] so the SKIPPER's location when this case was filed is the crucial fact.

---

[2] *See Flowers Indus., Inc. v. F.T.C.*, 835 F.2d 775, 777 (11th Cir. 1987) ("venue must be determined based on the facts at the time of filing."); *accord AGIS Software Dev. LLC v. T-Mobile USA, Inc.*, 2021 WL 6616856, at *1 n.1 (E.D. Tex. Nov. 10, 2021); *Int'l Techs. & Sys. Corp. v. Samsung Elecs. Co. Ltd*, 2018 WL 4963129, at *6 (C.D. Cal. June 22, 2018).

This fact means that venue in this District is proper under 28 U.S.C. § 1355(b)(2), which grants venue in this District when the defendant property is "located in a foreign country." At least one court in this District has held that the phrase "located in a foreign country" covers property on the high seas. *Matter of Seizure & Search of Motor Yacht Tango*, 597 F. Supp. 3d 149, 152 n.2 (D.D.C. 2022). And this statutory construction makes sense, because a contrary construction would lead to a perverse result where *no* district had venue for a civil forfeiture case over property on the high seas. Presumably such a gap is not what Congress intended. Rather, Congress provided catch-all venue in this District for property located outside the United States, which includes property on the high seas.

Windward's citation to 28 U.S.C. § 1395(c) (Mot. at 14) does not suggest any contrary rule. As Windward admits, Section 1395(c) applies to property seized outside a judicial district but then brought into a judicial district. It grants venue in the district that the property was brought into. But that provision has no application to cases where the property is located on the high seas at all relevant times and is never brought into a district. There must be *some* district where such cases can be venued, and the logical conclusion is that the catch-all DDC venue grant in Section 1355(b)(2) covers such cases.

### C. The Complaint Sufficiently Pleads Forfeitability

Windward next argues that the Complaint does not sufficiently plead forfeitability under 18 U.S.C. § 981(a)(1)(G)(i), which authorizes forfeiture of "all assets, foreign or domestic, affording any person a source of influence over" terrorist actors. But the Complaint pleads in detail how Iran's Islamic Revolutionary Guards Corps (IRGC) and IRGC-Quds Force (IRGC-QF) are terrorist actors under Section 981(a)(1)(G)(1). Complaint ¶¶ 6, 15-19. Windward does not challenge the sufficiency of these allegations. The Complaint also pleads in detail how Iranian oil

is owned by the state and how revenues from the sale of Iranian oil are critical to funding the IRGC's and IRGC-QF's operations. *Id.* at ¶¶ 8-15, 20-21. Windward does not challenge the sufficiency of these allegations either. Finally, the Complaint pleads in detail how the SKIPPER has repeatedly transported millions of barrels of Iranian oil over the course of years. *Id.* at ¶¶ 40-46. The Complaint even details specific journeys that the SKIPPER took on specific dates to transport specific volumes of Iranian oil. *Id.* Based on this pervasive transport of Iranian oil and the SKIPPER's efforts to hide its location (*id.* at ¶¶ 31-33), the Complaint pleads that the SKIPPER is a "ghost fleet tanker for Iran." *Id.* at ¶ 50.

It follows that the SKIPPER affords its owners and operators a "source of influence" over the IRGC and IRGC-QF. As the Complaint pleads, the IRGC and IRGC-QF are financially dependent upon sales of Iranian oil, and the SKIPPER is part of the fleet of ghost tankers that facilitate these Iranian oil sales. Thus, the IRGC and IRGC-QF are dependent upon tankers like the SKIPPER for their economic lifeblood. Tankers like the SKIPPER thus give their owners and operators a major source of influence over the IRCG and IRGC-QF, since they control the economic lifeblood for the IRGC and IRGC-QF.

Notably, Windward admits that courts in this District treat "source of influence" as synonymous with whether the subject property is "used to further the affairs of the enterprise." Mot. at 15-16 (quoting *United States v. Oil Tanker Bearing Int'l Mar. Org. No. 9116512*, 480 F. Supp. 3d 39, 46 (D.D.C. 2020)). Here, Iranian ghost tankers like the SKIPPER "further the affairs" of the IRGC and IRGC-QF by ferrying the Iranian oil that the IRGC and IRGC-QF depend on to fund their operations. Other courts in this District have reached similar conclusions. *See, e.g., United States v. $601,426.19 of Funds Associated With Dynapex Energy Ltd.*, No. 24-CV-542, 2024 WL 4854310, at *7 (D.D.C. Nov. 21, 2024) ("The Defendant Funds were . . . transferred

through and by the potential claimants to facilitate the illicit trade of Iranian oil products . . .
Accordingly, the Government has furnished facts that support a reasonable belief that the potential
claimants used the Defendant Funds to 'further the affairs of the enterprise' and 'make the IRGC's
prohibited conduct less difficult,' thereby affording the potential claimants a 'source of influence'
over the IRGC-QF") (quoting *Oil Tanker*, 480 F. Supp. 3d at 46); *accord United States v. All
Petroleum-Prod. Cargo Aboard the Bella*, No. CV 20-1791 (JEB), 2021 WL 4502056, at *4
(D.D.C. Oct. 1, 2021) (agreeing that Iranian oil gave the oil's transporters "influence over the
IRGC because the terrorist group relies on cash from the illicit sales of Iranian petroleum.").

Windward argues that transporting Iranian oil cannot afford persons a source of influence
over the IRGC or IRGC-QF because the U.S. Treasury Department recently, temporarily, and
narrowly authorized the sale, delivery, or offloading of crude oil or petroleum products of Iranian
origin for 30 days in March 2026, in an effort to calm global energy markets. Mot. at 16-18. The
now-expired authorization, titled General License U, applied for a limited time period to specific
sanctions programs administered by the U.S. Treasury Department, Office of Foreign Assets
Control ("OFAC").[3] Notably absent from the specific sanctions programs covered by General
License U is the Foreign Terrorist Organizations Sanctions Regulations ("FTOSR"), 31 C.F.R.
Part 597, pursuant to which — among other sanctions programs — the IRGC and IRGC-QF are
designated. Besides relying on materials outside the Complaint, which is improper for a 12(b)(6)
motion, Windward's argument ignores the clear distinction between sanctions laws and

---

[3] As noted above, General License U was issued on March 20, 2026, and authorized certain
transactions involving Iran-origin oil through April 19, 2026. The period in which General License
U was effective does not apply to any period in which the SKIPPER provided services for the
benefit of Iran, NIOC, and the IRGC and IRGC-QF. By the time of General License U's issuance,
the SKIPPER had been in U.S. Government control for over three months.

regulations, which are administered by OFAC, and the material support statutes, which are not administered by OFAC.

Windward nonetheless argues that if sale of Iranian oil supported the IRGC and IRGC-QF, the Treasury Department's authorization of Iranian oil transactions in March 2026 "would be illegal" under 18 U.S.C. §§ 2232(b) and/or 2339B. Mot. at 17. Not so. As noted above, this argument fails to consider the clear distinction between sanctions laws and regulations and the material support statutes. The sanctions regulations published and administered by OFAC each note this distinction. For example, the National Iranian Oil Company ("NIOC") is designated under multiple sanctions programs, including the Global Terrorism Sanctions Regulations ("GTSR"), to which General License U applied for the short time it was in effect. However, the GTSR clearly states that "[n]o license or authorization contained in or issued pursuant to this part [*i.e.*, General License U and the GTSR] relieves the involved parties from complying with any other applicable laws or regulations [*e.g.*, the material support statutes, such as 18 U.S.C. § 2339B]." 31 C.F.R. § 594.101. The Foreign Terrorist Organizations Sanctions Regulations ("FTOSR"), to which General License U did not apply and under which the IRGC and IRGC-QF are designated, is even more explicit in its limiting language. In addition to the verbatim language contained in the GTSR (*see* 31 C.F.R. § 594.101(b)), the FTOSR notes that "[t]his part does not implement, construe, or limit the scope of any criminal statute, including (but not limited to) 18 U.S.C. 2339B(a)(1) and 2339A, and does not excuse any person from complying with any criminal statute, including (but not limited to) 18 U.S.C. 2339B(a)(1) and 18 U.S.C. 2339A." 31 C.F.R. § 594.101(c).

Given the above, the Treasury Department did not "impermissibly legalize" (Mot. at 17) material support to the IRGC or the IRGC-QF. The relevant regulations make clear that

7

authorizations like General License U do not limit the reach or applicability of the material support statutes. The adequately-pled fact that Iranian oil revenues support the IRGC and IRGC-QF does not vanish just because the U.S. Executive issued "a narrowly tailored, short-term authorization," *id.*, for the subset of Iranian oil transactions that do not ultimately benefit the IRGC or IRGC-QF.

With respect to Windward's arguments concerning 18 U.S.C. § 2232(b), the reasoning similarly makes no sense. Section 2232(b) prohibits the transfer of a civil forfeiture *res* with the intent to frustrate the court's *in rem* jurisdiction. But even if some small fraction of Iranian oil in the marketplace were the subject of a U.S. civil forfeiture suit, the Treasury Department did not transfer this oil—nor impede any court's jurisdiction—by temporarily authorizing Iranian oil transactions. If a civil forfeiture court had *in rem* jurisdiction over some tranche of Iranian oil before the Treasury Department's authorization, it equally had jurisdiction after the Treasury Department's decision.

Finally, Windward argues that Section 981(a)(1)(G)(i) is phrased in the present tense, only authorizing forfeiture of property that is currently "affording" a person a source of influence over a terrorist organization. Mot. at 18-19. This temporal argument is effectively foreclosed by the D.C. Circuit's recent opinion in *United States v. All Petroleum- Prod. Cargo Onboard M/T Arina*, -- F.4th --, 2026 WL 1073317 (D.C. Cir. Apr. 21, 2026), which held that Section 981(a)(1)(G)(i)'s reference to assets of a terrorist organization covers assets that were owned at any time by a terrorist organization, whether or not they are so owned at the time of seizure. *Id.* at *3. *Arina* explained that, under the relation-back doctrine, forfeitability attaches upon commission of the offense giving rise to forfeiture. Thus, if an asset is ever owned by a terrorist organization, it becomes forfeitable, and potential subsequent ownership changes do not cleanse that forfeitability. *Arina*'s holding and logic apply equally to the "affording" clause of Section

981(a)(1)(G)(i), such that an asset is forfeitable (and remains forfeitable) if it ever afforded a person a source of influence over a terrorist organization.

In any event, Windward's temporal argument would fail even if Windward were correct that forfeiture only extends to assets that currently afford a person a source of influence over a terrorist organization. This is because the Complaint pleads that the SKIPPER *currently is* a member of the Iranian ghost fleet. Complaint ¶ 50. The SKIPPER's repeated voyages to transport Iranian oil lasted through at least July 2025 (*id.* at ¶ 46), which was just a few months before the SKIPPER was seized. This recent activity amply supports the Complaint's present-tense allegation that the SKIPPER still is part of the Iranian ghost fleet and thus still affords its owners and operators a source of influence over the IRGC and IRGC-QF.

Put differently: even if Windward's temporal construction of Section 981(a)(1)(G)(i) were correct, it would be immaterial whether the SKIPPER was carrying Iranian oil at the precise moment of seizure. As long as the SKIPPER were a current member of the Iran ghost fleet, it would afford its owners and operators an ongoing source of influence over the IRGC and IRGC-QF. And as detailed above, the Complaint more than adequately pleads that the SKIPPER is a current member of the Iran ghost fleet.

**D.  Windward's Motion to Suppress the SKIPPER's Cargo Should Be Denied**

Finally, Windward argues for suppression of the SKIPPER's cargo as evidence, on the theory that the Government unlawfully seized the cargo in violation of the Fourth Amendment's warrant requirement. Mot. at 19-21. The Government strongly disputes that it acted improperly, and Windward all-but-agrees. For example, Windward admits that the Government had a seizure warrant for the SKIPPER and that "it may have been a practical necessity for the Government to

9

seize the cargo along with the vessel." *Id.* at 19. Windward also does not cite any case where a Fourth Amendment violation was found in circumstances remotely similar to these.

But the point is moot, because the Fourth Amendment does not even apply here. More than 35 years ago, the Supreme Court held that the Fourth Amendment does not apply to searches and seizures of non-U.S. citizens and non-U.S. resident aliens conducted by U.S. government agents outside the United States. *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990). Numerous courts have confirmed that *Verdugo-Urquidez'*s rule applies equally to searches and seizures in international waters as it does to searches and seizures in foreign countries. *See, e.g., United States v. Cabezas-Montano*, 949 F.3d 567, 593 (11th Cir. 2020) ("the Fourth Amendment does not apply to searches and seizures (arrests) by the United States of a non-citizen/non-resident alien arrested in international waters or a foreign country.") (citing cases). These lower court holdings are unsurprising, given that *Verdugo-Urquidez* anchored its own holding in the fact that "[t]here is [] no indication that the Fourth Amendment was understood by contemporaries of the Framers to apply to activities of the United States directed against aliens in foreign territory *or in international waters*." *Verdugo-Urquidez*, 494 U.S. at 267 (emphasis added).

Because the SKIPPER and its cargo were seized in international waters, the Fourth Amendment does not apply and Windward cannot argue that the seizure of the cargo worked a Fourth Amendment violation.

### E.  Conclusion

For the foregoing reasons, the Government respectfully requests that Windward's motions be denied.

Dated:  May 13, 2026
Washington, D.C.

Respectfully Submitted,

Jeanine Ferris Pirro
United States Attorney

By:  ____*/s/ Rajbir Datta*_____
        Rajbir Datta; N.Y Bar 5206073
        Assistant United States Attorney
        U.S. Attorney's Office
        District of Columbia
        601 D Street, N.W.
        Washington, D.C. 20579
        (202) 252-7687
        Rajbir.Datta@usdoj.gov

John Eisenberg
Assistant Attorney General
National Security Division

By:  ___*/s/ Sean Heiden*_____
        Sean Heiden
        D.C. Bar 1617636
        Acting Deputy Chief
        Counterintelligence and Export Control
        National Security Division
        U.S. Department of Justice
        Sean.heiden2@usdoj.gov

Margaret A. Moeser
Chief
Money Laundering, Narcotics and Forfeiture
Section, Criminal Division
U.S. Department of Justice

By:  ___/s/ *Joshua L. Sohn*_____
        Joshua L. Sohn
        Trial Attorney

11